PHYLLIS C. RADVILAS *vs.* STOP & SHOP, INC., & others.[1]

Suffolk. April 10, 1984. — August 2, 1984.

Present: ARMSTRONG, CUTTER, & WARNER, JJ.

*Anti-Discrimination Law,* Prima facie case.

In an action by a female employee against her employer asserting discrimina-
tion against her based on sex and age, evidence that the employee was
not transferred to a vacant position for which she had applied and that
a younger person, a male, was appointed to the position was sufficient
to present a prima facie case of discrimination, despite deficiencies in
the evidence respecting the employee's qualifications for the position.
[438-442]

In an action by an employee of a corporation asserting that because of her sex
and age she had been discriminated against by the corporation and three
of its employees, the evidence was insufficient to present a prima facie
case against any of the individual defendants. [442-443]

In an action by an employee claiming that the employer's pay practices dis-
criminated against her under the Equal Pay Act, 29 U.S.C. §§ 206 (d)
and 215 (a) (1976), the judge did not err in directing a verdict for the
employer where the employee failed to introduce evidence that the work
performed by certain employees who were paid more than she was
comparable to the work performed by her. [444]

CIVIL ACTION commenced in the Superior Court Department
on July 16, 1980.

The case was tried before *Cashman,* J., sitting under statu-
tory authority.

*Frederick T. Golder* for the plaintiff.

*Richard J. Levin* for the defendants.

---

[1] James Joyce, Paul Nee, and George Pavek, each an employee of Stop
& Shop, Inc., while Mrs. Radvilas also was an employee. She apparently
complied with the conditions precedent to litigation, see G. L. c. 151B,
§ 9, by filing a complaint with the Massachusetts Commission Against
Discrimination and obtaining permission to sue.

CUTTER, J. Mrs. Radvilas (hereafter Radvilas) filed a complaint in the Superior Court against Stop & Shop, Inc. (S & S), and three of its employees alleging discrimination against her. Count I, in very general terms for the most part, asserted violations (sex and age discrimination) by S & S of G. L. c. 151B. Count II, in similar manner, charged discrimination against Radvilas in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 et seq. (1976), and also under G. L. c. 12, § 11I. Count III charged pay practices discriminating against her under the Equal Pay Act, 29 U.S.C. §§ 206 (d) and 215 (a) (1976). At the close of Radvilas's evidence, a judge of a Juvenile Court, sitting in the Superior Court by designation, allowed the defendants' motions for directed verdicts. Radvilas appeals from judgments for the defendants and from the denial of her motion for a new trial. We conclude that the trial judge should not have granted S & S's motion for a directed verdict for it on Counts I and II. Otherwise the judgments are affirmed. The jury, on the evidence, would have been warranted in finding the facts summarized below.[2]

Radvilas (at trial in 1983, 54 years old) was hired by S & S in 1968 as a "warehouse worker" at S & S's distribution center in Braintree. Her job at first was as one of a small number of employees receiving orders from S & S's retail stores and distributing garments to them. She then "went on to receiving."[3] She would "size the garments and hang them." She was a re-

---

[2] All the evidence consisted of testimony of Radvilas, various exhibits (principally periodic company reviews of her work) offered through Radvilas, and some answers to interrogatories. Radvilas was a witness not easily confined by the judge or by her counsel (a) to answering only the questions put to her and (b) to testifying only on matters within her own knowledge. Her expansive answers to questions (and her counsel's failure to control her) caused the judge to suggest that, if the witness's behavior continued, there would be a mistrial. On objection for the defendants, some evidence was struck. This, however, was not done with precision and there is some uncertainty about what parts of Radvilas's testimony have been struck. On retrial of the issues to be retried, the trial judge and counsel obviously should control the witness appropriately.

[3] Apparently "receiving garments," although the testimony about the nature of Radvilas's duties at all stages of her employment by S & S is diffuse

ceiver until May, 1977, when she was made a grade 21 employee and a full-time supervisor assigned to the "part-time shift".

Radvilas worked in "the soft-lines area" and "took care of" that area on the part-time shift (as the only supervisor in that area) from 5 P.M. to 10 P.M., with the assistance of Frank Martin, a shift leader (grade 22) when she needed help. There were, on the same shift, Dan Devine, supervisor of "the soft lines, bulk area," and Alfred Bortolotti, supervisor of "the dock area."[4]

In June, 1977, James Joyce came from the Readville facility to be assistant to Connor Maguire, then manager of S & S's Braintree facility. Shortly after Maguire introduced him to Radvilas, apparently before she was made a supervisor, Joyce made to her a coarse remark and occasionally other remarks of an offensive character.[5] Radvilas testified that she, because

---

and indefinite. The job descriptions of, and necessary qualifications for, particular posts occupied by Radvilas, or referred to by her, also were not stated in coherent fashion. This has made it difficult for the judge and for us reasonably to understand the qualifications for, and the responsibilities of, these positions.

[4] Radvilas would report for work at 1:30 P.M. and check with supervisors, in charge during the day of other areas, who would leave work to be done by the part-time shift after 5 P.M. She made the check in order to notify the shift supervisor of the number of workers each area would require that evening. When Devine resigned or was laid off in December, 1977, she took over his bulk area work on the part-time shift for about ten months until October, 1978, in addition to work "on the mezzanine" because they "were short of supervisors." In October, 1978, William Cullen, then about 26 or 27, already a grade 21 supervisor, was transferred from S & S's Readville facility to work on the part-time shift. Alfred Bortolotti (probably in his late twenties, although the evidence left that uncertain), supervisor of the dock area, had worked for S & S before she did. He and other supervisors in her general work area had been employed before she was and had been supervisors before she was.

[5] The improper and unacceptable remarks, if accurately reported, obviously should not have been made by Joyce. About them Radvilas made no complaint to any S & S officer, because she found the incidents "degrading enough without having to talk to . . . men about it." Radvilas's testimony (a) concerning Maguire's comments and actions mentioned in the text; (b) that he was "sensitive to all employees' problems" and "would take action on problems" brought to him, (c) her somewhat similar views of Capozzi (see note 8, infra), and (d) concerning S & S's affirmative action instructions,

"ashamed," did not report the precise first remark to Maguire or to other supervisors. When on one occasion she complained to Maguire about Joyce's manners, Maguire said that it was necessary to give Joyce time to adjust to a new area and that he was sure "in time . . . Joyce will adjust." During the first week after Radvilas had been promoted to supervisor, Maguire called Joyce and Radvilas to his office and asked "Joyce if he would help . . . [her] rather than degrade . . . [her] and hinder" her on her job. Joyce replied that Radvilas "was doing the best . . . [she] could" and "agreed that he would try to make . . . [her] job easy." Radvilas testified that, as a result, there was no drastic change in the situation. Other complaints of allegedly improper or discriminatory treatment are summarized in the margin.[6]

In October, 1978, Radvilas applied to Pavek, the district distribution manager of the Braintree, Readville, and New Haven warehouses, for transfer to fill a prospective vacancy on the day shift (7 A.M. to 3 P.M.) as "bulk" supervisor. Pavek made "no comment" on her inquiry but "listened." She testified that she had been "doing that job at night." The position was filled (in June, 1979, while she was on vacation) by Frank

tend to negate any suggestion that Joyce's remarks were tolerated by company policy. In the view we take of the case, they have little bearing on the present result because they have not been shown to have affected any employment decision.

[6] (a) Radvilas complained that Joyce had reprimanded her in a loud voice, in the presence of a male supervisor and two women employees, when she had gone out of "the chain of command" to get from Maguire and Paul Nee (who became manager when Maguire retired) extra help in a busy period. For this Joyce apologized later that day. (b) Radvilas had difficulties in 1978 during a snow storm in keeping some women employees working on a rush job instead of letting them go home early with the job incomplete. She was not permitted to pay her employees for a full day although they had worked less than that. Joyce had allowed Bortolotti to pay his male employees for time not worked on that occasion. (c) She testified about an occasion when Nee, in the presence of women workers, complained in a loud voice about her placing the name of one worker on an extra work roster, and stood over her to see that she did it and kicked her desk. (d) She claimed to have recommended (without action on either recommendation) to Maguire, before he retired, two women for promotion to the grade of supervisor. She made no showing that any vacancies existed or with respect to the qualifications of the women.

Lessard. He was a man of about thirty-seven, who "had worked in hard lines" for at least one well-known company apparently owning similar warehouse facilities. The transfer would have involved for Radvilas no difference in pay or benefits but different, longer hours of work. She never spoke to Pavek about the failure to appoint her but did speak to Frank Martin (grade 22) who had been her shift leader at night. He was the only supervisor, so long as Radvilas worked for S & S, who had "requested day [work] and got it."

Radvilas received various reviews of her work as supervisor, one after about six months and two in 1978. Both 1978 reviews described her, under the heading of "Overall Evaluation," as having overcome the obstacle of being the first woman supervisor, "a fact not accepted too well by some people who doubted she could do the job." One version of this appraisal, signed only by Maguire and Joyce, then described her as having "done an extraordinary amount of training . . . [of] employees so that" her "shift is extremely efficient," as having "become an excellent supervisor," and as having "proved a woman can do the job as well as any man or better." The later review deleted this complimentary language and substituted, "She has done well in any task assigned to her and is rapidly becoming a good supervisor."[7] Both appraisals stated, "The biggest challenge Phyllis [Radvilas] will face . . . is the ability to adjust to any situation that confronts her while performing her supervisory duties."[8]

---

[7] The eliminated language appeared to some extent, in what seems to be the later version of her 1978 appraisal, under the heading "Managerial Development," as follows: "Phyllis was promoted from the work force in May, 1977 and assigned to help supervise the second shift. . . . as a supervisor she was assigned to supervise the soft goods operation on the second shift and has done a good job. After a period of learning the other areas of the operation i.e., bulk processing, quick pik, data phone, breakdown, etc., she proceeded to train employees on the shift *to perform all the functions performed on the day shift*. This meant teaching them to receive merchandise, distribute, ticket, pack, do data phone orders and breakdown and work on store returns. Teaching a large group of people to perform these duties correctly takes patience and know how." (Emphasis supplied.)

[8] Radvilas testified that Maguire had told her Pavek thought the earlier appraisal "was too good." That appraisal was changed. On cross-examina-

Maguire retired on July 27, 1979. On the following Monday, Nee (Maguire's successor) became manager of the warehouse. The supervisors were told "that there would be extended hours for the rest of the week" because the warehouse was "exceptionally busy." The supervisors were to be "working in the second shift from one-thirty [P.M.] to" midnight. Radvilas left the warehouse at 10 P.M. because (among other reasons) she had not brought an extra lunch with her. Bortolotti and Cullen, the other supervisors, as far as Radvilas knew, worked until midnight. Radvilas testified that she had not been given advance notice of the change in schedule. Either on that day or the next, she talked with Nee and Bortolotti and complained about various grievances[9] and "refused to work those hours along side the other supervisors . . . [who] were [she claimed] making more money." Nee told Radvilas "that all supervisors were expected to work the same hours." She told him "[t]his was unfair" and that she "had no intention to work under those terms." She then said, "You can take the job and shove it but you will never hear the end of it," and she left the facility.

That afternoon Capozzi (see note 8, *supra*) and his secretary came to her apartment.[10] Radvilas requested "a meeting with

---

tion Radvilas in effect conceded that a periodic review of a supervisor's work had to go through the entire chain of command and that she had been told (by Dan Donagan, S & S's vice president of distribution, and by Capozzi, S & S's personnel manager) it was improper for a supervisor to see a copy of her or his review before it was accepted, "and they wanted reviews to leave room for improvement." Despite the revision of her review she then still received a pay raise in late 1978. Examination of the original exhibits suggests that the earlier was a draft acceptable to Maguire and Joyce but revised at the request of their superiors.

[9] One grievance then put forward was her claim that, when she worked overtime, she was not given supper money as male supervisors were. On cross-examination she testified that (a) she had been told by Martin to make out a written request for the allowance for Pavek's approval, (b) she had done so, and (c) she had not received the allowance. She conceded, however, that she did not know whether other supervisors had been paid the allowance and that she "never went to talk to . . . [Pavek] when . . . [she] didn't get paid." Some part of this testimony, on objection, was struck from the record, but there is uncertainty just how much was struck.

[10] Radvilas on cross-examination could not remember whether Capozzi had then told her that $290 "a week wasn't bad pay and that . . . [she] should reconsider."

someone higher up in" S & S and Capozzi set up a long meeting with Donagan (see note 8, *supra*), at which Radvilas told them her grievances.[11] There was a second meeting at which both sides of her complaints were discussed. She said that she would go back to S & S only if she were paid $19,000 for nights and $18,500 for days, and S & S, "didn't come up with anything" with respect to what she had asked. She then added, "But we would have compromised."

The trial judge admitted in evidence against Joyce (who had not been summoned in behalf of Radvilas) certain answers filed by Joyce to Radvilas's interrogatories.[12] The judge ex-

---

[11] As to these, on cross-examination, Radvilas admitted (in addition to other concessions by her already mentioned): (a) She knew Maguire to be fair and that he "worked harder for affirmative action" than she did. (b) She did not go to Robert Boori with complaints although she knew Boori and Maguire "were the two . . . [who] made final decisions with respect to what happened in the warehouse." (c) She never heard an anti-woman remark from Nee, Pavek, Boori, or Maguire, or an age related remark from any of them. She conceded that S & S had an "affirmative action book" and that Capozzi "preached . . . [it] to all the supervisors." (d) She was told when she became a supervisor "that from time to time the supervisors would be required to work extra hours" especially "during the busy seasons." (e) She sued Pavek "because he didn't tell . . . [her] his reasons for hiring . . . Lessard." She denied having been told at the time of Lessard's appointment that Lessard had been for "fifteen years . . . a warehouse supervisor" for two leading companies with warehouse problems. (f) In December, 1977, three supervisors, who had been supervisors when she was promoted to supervisor, were laid off at a time when she received a raise in pay. (g) When she was appointed supervisor, Joyce prescribed a training program for her to follow. Some areas, particularly the "hard lines," were then new to her. She went through the items of the program as she "had the time, but did not get to all of them because" of work pressures.

[12] Those answers admitted in evidence included Joyce's statement that he had no authority to act on promotions but that he had recommended Bortolotti for appointment as "second shift manager" (or leader) because of Bortolotti's "prior experience in the corporate and hard lines areas of the [Braintree] facility and his knowledge of the loading and transit shipping functions," whereas Radvilas "had only worked in the soft lines distributions areas of the warehouse." Joyce also seems to have admitted in an answer (although the offer may have been withdrawn) that the Braintree center had over 400 permanent and part-time employees and large numbers of temporary help put on each summer and fall. The judge also received in evidence the names of the four or five female supervisors who worked for S & S in 1977, the dates when they first became supervisors, and their initial salaries. Each of

cluded part of Joyce's answer to an interrogatory which asked the names, addresses, and salaries, for each of the years 1977 through 1980, of all male supervisors. Joyce had listed these and had shown the grade of each such supervisor. Only a few grade 20 employees were thus listed. The others ranged at least from grade 21 to grade 25. The exhibit showed for each listed supervisor only the job title (usually not very informative), the facility at which the supervisor worked, the supervisor's grade, and the dates and amounts of salary changes. There was no showing in the answer of the duties and responsibilities of any position, of the prior experience and training of any listed supervisor, or of the hours during which the supervisor worked.

No foundation was laid for the propriety of a comparison between (a) the scanty description in the record of Radvilas's duties, responsibilities, experience, activities, and working conditions with (b) the same aspects of the work and qualifications of any male supervisor. No testimony was offered as to what the employment grades in S & S's compensation structure (e.g., 20, 21, 22, and above) meant or implied or what significance and salary effects S & S gave to longevity within any particular grade. The judge excluded the answer at least until Radvilas's counsel was prepared "before the trial is ended . . . to compare apples with apples, rather than apples with oranges." He pointed out also that a company may reasonably come to the conclusion that certain supervisory capacities and positions are more important than others.[13]

1. The principles governing whether there can be recovery, based upon sex discrimination, under G. L. c. 151B are discussed in *Wheelock College* v. *Massachusetts Comm. Against Discrimination,* 371 Mass. 130 (1976), which (at 135 & n.5)

---

them except Radvilas was a grade 20 employee with a lower initial salary than Radvilas's $240 a week at grade 21 in 1977.

[13] Radvilas, recalled as a witness, went over the list of supervisors which had been excluded to attempt to identify male supervisors (a) who were not supervisors before she was and (b) who were receiving more pay in grade 21 than she was. She failed to identify any such person about whose antecedents she had knowledge.

adopts essentially the procedural requirements of *McDonnell Douglas Corp.* v. *Green,* 411 U.S. 792, 802 & n.13 (1973). Although the *McDonnell Douglas* case involved alleged racial discrimination, similar principles govern cases of sex (and old age) discrimination under G. L. c. 151B. See *Smith College* v. *Massachusetts Comm. Against Discrimination,* 376 Mass. 221, 229 (1978). Under the *McDonnell Douglas* case (at 802), if the party alleging that he or she is the victim of discrimination establishes a prima facie case (the elements of which are discussed below), that preliminary proof causes a shift to the employer of the burden to come forward with evidence to show that its allegedly discriminatory decision was based on some legitimate, nondiscriminatory reason. See *Trustees of Forbes Library* v. *Labor Rel. Commn.,* 384 Mass. 559, 565-567 (1981); *Furnco Constr. Co.* v. *Waters,* 438 U.S. 567, 576-578 (1978). The "burden of persuasion remains with the employee, who must prove by a preponderance of evidence that the asserted lawful reason was not the real reason for the" decision (see the *Forbes Library* case at 566) or that the employer's practices were a pretext for discrimination. See generally Schreiber, Massachusetts Employment Discrimination Law 63 Mass.L.Rev. 247 (1978).

The present case, of course, is not one of alleged discrimination in connection with original employment but asserts discrimination in connection with either a desired transfer or a promotion.[14] "Adjusting the *McDonnell* formula to cases of discriminatory refusal to promote [or to transfer] is relatively simple." See *Bundy* v. *Jackson,* 641 F.2d 934, 951 (D.C. Cir. 1981), where it was said also that, in a promotion situation, "to make out a prima facie case the plaintiff must show that she

---

[14] Nor was it a decision terminating Radvilas's employment. Indeed, Radvilas did not establish that she did not resign. Her statements to Capozzi and Donagan showed that she would be willing to work for S & S if they would pay her more and had no tendency to prove that she was forced to leave. Capozzi's and Donagan's successive interviews with Radvilas in no respect suggest that she was being discharged. We perceive no evidence of conduct amounting to "constructive discharge." See *Pena* v. *Brattleboro Retreat,* 702 F.2d 322, 325-326 (2d Cir. 1983). Compare *Rosado* v. *Garcia Santiago,* 562 F.2d 114, 117, 119-120 (5th Cir. 1977).

belongs to a protected group, that she was qualified for and applied for a promotion, that she was considered for and denied the promotion [or transfer], and that other employees of similar qualifications who were not members of the protected group were indeed promoted at the time the plaintiff's request for promotion was denied". Applying these principles to Radvilas, we consider principally[15] her application for transfer to the day shift post of supervisor of the bulk area.

Radvilas did show that, as a woman and as a person over forty years of age, she was a member of two protected groups. She showed that she had applied to Pavek for the transfer to day work and that presumably he had considered her for transfer. She was not given the transfer. She showed that Lessard, a male under forty, was appointed to the post. There are, however, two significant questions relating to whether she made out a prima facie case of discrimination against her because of the appointment of Lessard: (a) Did she establish what the duties, responsibilities, and qualifications for the post were?[16] (b) Did she show that she was qualified for the transfer?

There was no proof whether the day job of a full-time bulk area supervisor was the same as the evening work by Radvilas

---

[15] There was no evidence (if, indeed, Radvilas argues) that she ever applied for the position of shift manager or leader to which Bortolotti was appointed in 1979, although she testified that she understood that she was "recommended for one who should be promoted." He, in any event, had been a supervisor before she had been promoted to that grade and had somewhat wider experience than Radvilas in different areas of work for S & S.

It should be noted that the final requirement of the *Bundy* case (promotion of qualified nonmembers of the protected group) is not readily adapted to the transfer situation, especially where the actual appointee is brought in from outside the employer's existing force.

[16] Some unduly broad or unresponsive general statements by her on direct examination (see note 3, *supra*) were probably limited (see note 11, *supra*) by her admissions and concessions on cross-examination. See Liacos, Handbook of Massachusetts Evidence 129-131 (5th ed. 1981); 9 Wigmore, Evidence §§ 2589-2594a (Chadbourn rev. 1981); McCormick, Evidence § 266 (2d ed. 1972); Hughes, Evidence § 516 (1961 & Supp. 1981). See, as to the binding effect upon a party introducing an adversary's answers to interrogatories which are not contradicted by other evidence, *Tanguay* v. *Wood Conversion Co.,* 347 Mass. 530, 532-533 (1964).

(as supervisor of the part-time shift) on unfinished bulk area work left by or which came in after the day shift. The record, indeed, contains no clear description of what was done in the bulk area at any time, day or night. The evidence of Radvilas's qualifications for the day-time bulk area job lies principally in her own statements[17] and in her two 1978 job appraisal reviews, see notes 7 and 8, *supra,* and related text of this opinion. That evidence gains no perceptible support from Radvilas's testimony about her grievances (see nn. 5, 6, 9, but compare n. 11).[18]

We recognize that "the burden of establishing a prima facie case of disparate treatment is not onerous." Radvilas was bound to "prove by a preponderance of the evidence that she applied for an available position for which she was qualified but was rejected" in circumstances which give rise to an inference of unlawful discrimination. See *Texas Dept. of Community Affairs* v. *Burdine,* 450 U.S. 248, 253-254 (1981). The judge did not rule expressly that Radvilas had not made out a prima facie case. He directed a verdict for the defendants after Radvilas had rested her case on the merits.[19]

---

[17] Radvilas testified that she had been doing the job of supervisor of the bulk area at night and that she told Capozzi (on the afternoon she left S & S when he and his secretary came to see her), "I asked . . . why . . . [Lessard] was hired" and why she was overlooked for the position. "I had . . . the years, the time, and I was quite capable of taking the job over, which I was doing at night."

[18] The only grievances which had any tendency to show (if believed) discriminatory practices based on sex were the isolated incident of alleged discriminatory treatment of special snowstorm work of Radvilas's employees (see item [b] n. 6) and the alleged denial of supper money (n. 9). The latter, Radvilas had not followed up and at least some part of her attempted proof had been struck. Neither grievance had any relation to Radvilas's qualifications, or to what the qualifications for the day bulk area job were. Neither grievance was shown to be reasonably recent when Radvilas ceased to work for S & S in late July, 1979. Certainly the snowstorm episode was earlier.

[19] See *United States Postal Serv. Bd. of Governors* v. *Aikens,* 460 U.S. 711, 714 (1983), where the court pointed out that where a case has been "fully tried on the merits, it is surprising to find" a discussion whether a prima facie case has been proved. See also *Key* v. *Gillette Co.,* Civ. No. 75-4934-C, slip op. at 10-13 (D. Mass. June 21, 1981).

We regard it as a close question whether Radvilas, on this somewhat disorderly record (see nn. 2, 3, 9), has established a prima facie case of sexual discrimination under the principles of the *McDonnell Douglas* opinion. The proof of discrimination against her based on sex consists essentially of the facts that she was not transferred to the vacant daytime job for which she had applied and that a man was appointed. All her proof suffers (see note 3, *supra*) from the failure to prove in explicit fashion what the qualifications for and the responsibilities of the daytime job were and what in fact Radvilas's own duties and responsibilities had been in her former job. Taking into account, however, particularly the language of her later 1978 appraisal (quoted, note 7, *supra*), we think enough was shown to permit an inference of her qualification to perform in the daytime the indefinitely described functions of the bulk area which she for a period had performed at night.

Obviously the judge would have been wiser to deny the motions for directed verdicts, to hear S & S's evidence of the reasons for its decision, and to submit the case to the jury. See *Soares* v. *Lakeville Baseball Camp, Inc.,* 369 Mass. 974, 975 (1976); *Cort* v. *Bristol-Myers Co.,* 385 Mass. 300, 304 n.4 (1982). Compare *Kalivas* v. *A. J. Felz Co.,* 15 Mass. App. Ct. 482, 486 (1983). Then, in the event of verdicts for Radvilas, he could have granted judgments n.o.v. if he then regarded all the evidence, including that produced by S & S (when the burden shifted to it of providing a nondiscriminatory explanation of its decision), as insufficient to satisfy her ultimate burden of persuasion. Because at least the minimum proof of sex discrimination required for a prima facie case under the *McDonnell Douglas* decision was present, it was error to direct a verdict for S & S on that issue.

With respect to the cases against the individual defendants, we think that, in the absence of proof whether and to what extent any one of them contributed to the allegedly discriminatory decision affecting Radvilas, the directed verdicts for them on this issue were proper. Whatever they did was not shown to be other than in performance of their duties for S & S. The proof was insufficient to constitute a prima facie case against any one of them.

2. Other than the fact of the 1979 appointment of Lessard (grade 22), then about thirty-seven years old, rather than Radvilas (grade 21 and in her late forties) to the post of day supervisor of the bulk area, no evidence tends to show age discrimination against Radvilas. No circumstantial evidence (except one rude remark by Joyce about the women working with Radvilas as the "change of life people") appeared to have any relation whatsoever to employees' ages. There was no showing that Radvilas, in any aspect of her employment, was treated differently from any other employee because of her age. Nevertheless, our conclusion that Radvilas had made out a prima facie case of sex discrimination seems controlling with respect to age discrimination. She (as a woman over forty and thus a member of a protected class) showed (a) that she was qualified for appointment to the daytime post and was not appointed, and (b) that a man under forty was appointed. This proof seems to satisfy the *McDonnell Douglas* principles about what constitutes a prima facie case. Those principles appear to be applicable to age discrimination as well as to race and sex discrimination. Also the principles and procedures applicable to age discrimination under G. L. c. 151B and under 29 U.S.C. §§ 621 et seq. (1976), appear to be generally comparable. See e.g., *Rock* v. *Massachusetts Commn. Against Discrimination,* 384 Mass. 198, 204-205 (1981). *Loeb* v. *Textron, Inc.,* 600 F.2d 1003, 1011-1018 (1st Cir. 1979); *Riley* v. *University of Lowell,* 651 F.2d 822, 823-824 (1st Cir. 1981); *Stendebach* v. *CPC Intl., Inc.,* 691 F.2d 735 (5th Cir. 1982), cert. denied, 461 U.S. 944 (1983); *Pena* v. *Brattleboro Retreat,* 702 F.2d 322, 323 (2d Cir. 1983); *Massarsky* v. *General Motors Corp.,* 706 F.2d 111, 117-120 (3d Cir. 1983). See also *Lovelace* v. *Sherwin-Williams Co.,* 681 F.2d 230, 239, 243-244 (4th Cir. 1982). Accordingly, we conclude that it was error to direct a verdict for S & S on so much of count I as alleged age discrimination and on count II under 29 U.S.C. §§ 621 et seq. (1976). For essentially the reasons already stated in part 1 of the opinion, we conclude that the evidence of particular actions by the individual defendants severally was insufficient to establish a prima facie case of age discrimination against any one of them.

3. Radvilas has not established under count III of her complaint and 29 U.S.C. §§ 203-216 (1976), that S & S paid a higher rate of compensation to any particular supervisor[20] for equal work on any job requiring "equal skill, effort, and responsibility . . . performed under similar working conditions." See *Corning Glass Works* v. *Brennan,* 417 U.S. 188, 195 (1974);[21] *Campbell* v. *Von Hoffman Press, Inc.,* 483 F. Supp. 218, 221 (W.D. Mo.), affd. per cur. 632 F.2d 69 (8th Cir. 1980). *Jacobs* v. *College of William & Mary,* 517 F. Supp. 791, 795-796 (E.D. Va. 1980), cert. denied, 454 U.S. 1033 (1981), where the proof of requirements of posts under comparison was much more complete; Sullivan, The Equal Pay Act of 1963: Making and Breaking a Prima Facie Case, 31 Ark.L.Rev. 545, 559-583 (1978). See also 29 Code of Federal Regulations, §§ 800.100 et seq., especially §§ 800.119-800.123, 800.125-800.132, 800.142-800.144 (1983). Radvilas has not proved what supervisory positions involved substantial comparability with her own under the statutory standards.[22]

4. The motions for directed verdicts were not merely general but were addressed specifically to each count of the complaint.

---

[20] Particular supervisors referred to by Radvilas (see note 12, *supra*), after examining an exhibit excluded by the judge (until Radvilas should establish that the jobs, duties and responsibilities of supervisors there mentioned were comparable to her own), were shown by the excluded material as follows: James Mingels (grade 21) was transferred to the Braintree center on August 13, 1979, at $300 a week. Lessard (grade 22) was appointed on June 25, 1979, as a lead supervisor at $400 a week. William Cullen (grade 21) was receiving $310 a week on May 22, 1978, when he was transferred to Braintree from S & S's Readville Perishable Distribution Center. See note 4, *supra*.

[21] No special circumstances have been established which would make relevant the principles discussed in *County of Washington* v. *Gunther,* 452 U.S. 161, 167-180 (1981).

[22] The judge in excluding (see note 13, *supra*), a schedule of S & S's pay scales may have placed undue emphasis on the pay and job grades given by S & S to the supervisors respectively, whose jobs presumably were offered as comparable to that held by Radvilas. The judge's ruling, however, did not preclude Radvilas from attempting to prove what the actual duties, responsibilities, and working conditions of specified male supervisors were and what the qualifications for those jobs were. She made no such attempt and thus had established no reasonable foundation for showing the salaries of such other supervisors.

The motion as to the claims against S & S on counts I and II should not have been allowed. The evidence and permissible inferences (within the range of reasonable probability and not based on "mere speculation and conjecture," see *Poirier* v. *Plymouth,* 374 Mass. 206, 212 [1978]) did not establish Radvilas's claims against the individual defendants upon count III. Radvilas's motions for a new trial presented no issues not already sufficiently discussed. The issues raised thereby are dealt with in effect by this opinion. The portion of the judgment entered on counts I and II for S & S is reversed. The balance of the judgment, for S & S on count III and for the individual defendants on all counts, is affirmed.

*So ordered.*