John A. TENNARO, Plaintiff,

v.

RYDER SYSTEM, INC., M & G Convoy, Inc., John A. O'Neil, Anthony Vallente, Terence Russell, Steven Nichols, Ralph O. Thompson, Lawrence Ervin, Raymond Doerfler, Defendants.

Civ. A. No. 91–40003–GN.

United States District Court, D. Massachusetts.

Sept. 10, 1993.

Convoy, Inc. ("M & G"), commenced this action against M & G, Ryder System, Inc. ("Ryder"), and various employees of M & G, alleging that the defendants discriminated against him on the basis of his age in violation of M.G.L.A. c. 151B, § 4. Tennaro's Second Amended Complaint ("the Complaint") asserts sundry other state law claims.[1] Pending before the Court is the defendants' motion for summary judgment on all counts of the Complaint.[2]

## I. BACKGROUND

As required in considering a motion for summary judgment, the Court reviews the facts in the light most favorable to the nonmovant. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986); *Griggs–Ryan v. Smith,* 904 F.2d 112, 114 (1st Cir.1990). Tennaro began working for M & G, a wholly owned subsidiary of Ryder, in June, 1971 as a supervisor of operations in Westboro, Massachusetts. M & G is in the business of overland transportation of automobiles from ports and rail heads to retail automobile dealerships. M & G's Westboro operation includes two facilities: the terminal in Westboro from which M & G dispatches its drivers (the "Terminal"), and a shop located in Ashland, Massachusetts, where M & G mechanics service and repair M & G's auto carrier fleet (the "Shop").

In February, 1989, defendant John A. O'Neil ("O'Neil") became manager of the Westboro operation and, as such, became Tennaro's immediate supervisor. The following month, O'Neil placed Tennaro in charge of operations at the Terminal for the times that O'Neil was away. That situation lasted until near the beginning of September, 1989, when O'Neil, at the suggestion of defendant Raymond Doerfler ("Doerfler"), vice president of operations at M & G, transferred Tennaro from the Terminal to the Shop. The purpose of the transfer was to round out

Evan T. Lawson, Jill M. Aubin, Lawson & Weitzen, Boston, MA, for plaintiff.

Dean Richlin, Lucash, Gesmer & Updegrove, Boston, MA, for defendants.

## MEMORANDUM AND ORDER

GORTON, District Judge.

John A. Tennaro ("Tennaro"), having been discharged from his employment with M & G

---

1. Jurisdiction is predicated on diversity of citizenship. Tennaro is a resident of Massachusetts; none of the defendants is a Massachusetts domiciliary; the amount in controversy exceeds $50,-000.

2. Count IX of the Complaint, alleging a failure to pay benefits as required by the Consolidated Omnibus Budget Reconciliation Act of 1985, has been settled by the parties.

the trucking industry education of Tennaro, who had not, prior to that time, had any experience with M & G's mechanics or their job functions.

After arriving at the Shop, Tennaro began organizing an awards banquet for the mechanics. In connection with the banquet, Tennaro repeatedly, though unsuccessfully, attempted to contact O'Neil by telephone over a three week period. On October 6, 1989, Tennaro contacted Brian Daley ("Daley"), an M & G vice president located in Michigan, complaining that O'Neil would not return his calls. Later that day, O'Neil telephoned Tennaro and said, "You took your best shot baby. Now it's my turn." Immediately after this incident, Tennaro began treating with Dr. Anthony Puopolo and a Dr. Taborelli for emotional distress. He continued treatment with a Dr. Kennedy through February, 1990.

On December 8, 1989, O'Neil, defendant Lawrence Ervin ("Ervin"), director of labor relations at M & G, and defendant Anthony Vallente ("Vallente"), assistant manager of the Westboro operation, entered Tennaro's office at the Shop, and requested Tennaro's resignation. Either O'Neil or Ervin explained that the request was based on the allegations of five M & G drivers who claimed that Tennaro had made derogatory comments about the company. Tennaro refused to resign and demanded to know the identity of his accusers. Ervin refused to reveal the names of the drivers and stated that if Tennaro did not resign, he would be fired. Either Ervin or O'Neil then informed Tennaro that the situation had been discussed with defendant Terence Russell ("Russell"), president of the auto carrier division at M & G, and that Russell made the decision to demand Tennaro's resignation. Upon hearing that information, Tennaro attempted to telephone Russell, but the phone was grabbed from him, and Ervin demanded his keys.

After Tennaro placed his keys on his desk, O'Neil said, "Come on, let's go." As Tennaro started to rise from his chair, O'Neil placed a hand under Tennaro's arm, assisting him from the chair. Tennaro then walked to the door, and Ervin said, "I'm sorry John," and

shook Tennaro's hand. O'Neil said again, "Come on, let's go," and may have touched Tennaro again. Ervin, O'Neil and Vallente followed Tennaro out to his car.

At approximately 5:00 p.m. that evening, Doerfler telephoned Tennaro and advised him that Russell wanted to meet with him in Detroit on December 12. That meeting took place at the Detroit airport and was attended by Tennaro, Ervin, Doerfler, defendant Ralph O. Thompson ("Thompson"), senior vice president of Industrial relations at M & G, and defendant Steven Nichols ("Nichols"), M & G's senior vice president and general manager. During the meeting, Tennaro stated that he did not like working for O'Neil and questioned his supervisor's integrity, specifically alleging that O'Neil had misused company funds. At the conclusion of the meeting, Thompson informed Tennaro that he was suspended pending further investigation. At Nichols' suggestion, Tennaro later forwarded documentation of his charges against O'Neil to Thompson.

By letter dated December 21, 1989, Thompson informed Tennaro that M & G decided to remove Tennaro from the Westboro operation. Thompson's letter explained that the decision was based not on the specific allegations against Tennaro, but rather on the conclusion that Tennaro could no longer work in Westboro, given his difficulties with O'Neil. Tennaro was offered a comparable position at M & G's terminal in Newark, New Jersey, at the same rate of pay. The alternative was a termination in accordance with the company severance policy. Through counsel, Tennaro rejected the transfer and requested that M & G reconsider its decision. By letter dated January 19, 1990, Thompson informed Tennaro that he and others had reconsidered their position, but arrived at the same conclusion. Thus, Tennaro's employment with M & G was terminated.

At the time of his termination, Tennaro was forty-eight (48) years old. On several occasions, O'Neil and Vallente had referred to Tennaro as "the old man here". They also stated that "starting with the original M & G Convoy is like the Dark Ages of trucking and car hauling." Additionally, Daley would

sometimes refer to Tennaro and another employee as the "old men".

Prior to Tennaro's termination, Russell had encouraged him to go to law school and had told him that if he had a law degree, he would have a good future in Ryder Systems. Russell informed Tennaro that his tuition would be reimbursed under M & G's tuition reimbursement program. Tennaro did, in fact, attend law school, and in the letter of January 19, 1990, Thompson informed Tennaro that M & G would continue to honor its tuition reimbursement program on Tennaro's behalf for any semester beginning on or before December 21, 1989. On occasion, Doerfler made comments to the effect that going into the law profession was "highly unlikely for a person of [Tennaro's] age."

During his tenure at M & G, Tennaro received annual performance evaluations on or near the anniversary of his date of hire, and typically received pay increases at about the time of his annual review. M & G also offers its employees an opportunity to participate in a pension plan. M & G's contributions to the plan are based on an employee's earnings and length of service. At the time of his termination, Tennaro was fully vested in the M & G pension plan.

## II. MOTION FOR SUMMARY JUDGMENT STANDARD

Summary judgment shall be rendered where the pleadings, discovery on file, and affidavits, if any, show "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court, in deciding defendants' motion, "must view the entire record in the light most hospitable" to Tennaro "indulging all reasonable inferences in [his] favor." *Griggs–Ryan*, 904 F.2d at 115.

## III. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants move for summary judgment on all counts of Tennaro's complaint. Counts I, II and III allege that various combinations of defendants violated Section 4 of M.G.L. c. 151B, the Massachusetts anti-discrimination statute, by discriminating against him on the basis of age. Additionally Count III appears to allege a claim of civil conspiracy against O'Neil, Ervin, Vallente, Doerfler, Nichols and Russell. The Complaint contains two counts labeled Count IV. Count IV(1) alleges that M & G and Ryder intentionally and/or negligently inflicted emotional distress upon Tennaro. In Count IV(2), Tennaro contends that O'Neil, Ervin and Vallente committed an assault and battery upon him. Count V alleges that Ryder and M & G are vicariously liable for the assault and battery of their employees. In Count VI, Tennaro claims that M & G breached its implied contract of employment with him. Count VII names Ryder and M & G and alleges wrongful termination and interference with pension rights. Finally, in Count VIII, Tennaro charges that the individual defendants interfered with his advantageous relationship with M & G.

### A. Ryder

Ryder has moved for summary judgment as to the five counts in which it is named (Counts I, II, IV(1), V, and VII). Those five counts all allege that Ryder acted improperly either through its agents (the individual defendants) or as Tennaro's employer. Ryder, however, denies that it ever employed Tennaro and further denies that any of the individual defendants ever acted as its agent with respect to Tennaro. According to Ryder, Tennaro was employed by M & G at all relevant times and the individual defendants were acting as agents of M & G. Tennaro has neither presented evidence nor argument contrary to Ryder's position.

Furthermore, Tennaro does not contend that this is an exceptional case under Massachusetts law in which the fiction of corporate separateness between a parent (Ryder) and its wholly owned subsidiary (M & G) should be disregarded. *See Miller v. Honda Motor Co., Ltd.*, 779 F.2d 769, 772 (1st Cir.1985); *American Home Assur. Co. v. Sport Maska, Inc.*, 808 F.Supp. 67, 73 (D.Mass.1992) ("Piercing the corporate veil is permitted only where there is confused intermingling between the corporate entities or where one corporation actively and directly participates in the activities of the second corporation, apparently exercising pervasive control.");

**498**

*My Bread Baking Co. v. Cumberland Farms, Inc.*, 353 Mass. 614, 233 N.E.2d 748, 752 (1968). Because Tennaro has presented no evidence that Ryder is liable for any injuries he may have suffered, the Court will allow the motion for summary judgment as to the Counts in which Ryder is named.

### B. Age Discrimination

M & G and the individual defendants also move for summary judgment as to Counts I and III, in which Tennaro contends he was discriminated against on the basis of his age. Count I alleges that the defendants' conduct in terminating Tennaro "constitutes age discrimination and harassment, a violation of M.G.L. ch. 151B, Section 4, paragraph 1." Count III alleges a concerted effort on the part of the individual defendants to bring about Tennaro's termination due to his age, also in violation of M.G.L. c. 151B, § 4. The Court assumes that Tennaro intends to refer to paragraphs 1B and 5 of Chapter 151B, § 4.[3] Paragraph 1B of Section 4 provides, in pertinent part:

It shall be an unlawful practice . . .

1B. For an employer in the private sector, by himself or his agent, because of the age of any individual, . . . to discharge from employment such individual, or to discriminate against such individual in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification.

Paragraph 5 of the same Section states:

It shall be an unlawful practice . . .

5. For any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter or to attempt to do so.

With respect to age discrimination cases, Massachusetts "adopts essentially" the familiar burden shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–805, 93 S.Ct. 1817, 1824–1825, 36 L.Ed.2d 668 (1973).

*Radvilas v. Stop & Shop, Inc.*, 18 Mass.App. Ct. 431, 466 N.E.2d 832, 837–840 (1984). Under that standard, once a plaintiff has made out a prima facie case of age discrimination, the burden shifts to the defendant to produce credible evidence of a legitimate, non-discriminatory reason for its actions. If the defendant produces such evidence, "the burden shifts back to the plaintiff to establish by a preponderance of the evidence that the reasons, ostensibly legitimate, put forward by the employer are a pretext for the real reason, unlawful discrimination." *Johansen v. NCR Comten, Inc.*, 30 Mass.App.Ct. 294, 568 N.E.2d 611, 612–613 (1991). *See also Smith College v. Massachusetts Com'n Against Discrim.*, 376 Mass. 221, 380 N.E.2d 121, 126–127 (1978).

For purposes of this motion, defendants concede that Tennaro has made out a prima facie case of age discrimination, i.e., 1) Tennaro was over forty years old, 2) he was qualified for his position in the sense that he was performing his job capably, 3) he was terminated, and 4) he was replaced by someone under the age of forty with qualifications similar to his own. *See Loeb v. Textron, Inc.*, 600 F.2d 1003, 1011–1013 (1st Cir.1979); *Radvilas*, 466 N.E.2d at 840.

The non-discriminatory reason for the dismissal proffered by the defendants is the deterioration in the working relationship between Tennaro and his immediate supervisor, O'Neil. Defendants point to Tennaro's statement at the December 12, 1989 meeting in Detroit that he did not like working for O'Neil.

Because defendants have set forth an age-neutral reason for their actions, the burden is on Tennaro to show that the proffered reason is merely pretextual and that the real reason is age discrimination. *See Johansen*, 568 N.E.2d at 612–613. Tennaro relies on the fact that the first time he was informed that he was terminated, December 8, 1989, was four days before his statement in Detroit

---

**3.** Prior to an amendment passed in 1984 (St. 1984, c. 266, §§ 5 and 6), paragraph 1 of M.G.L.

c. 151B, § 4 included a reference to age discrim-

about O'Neil.[4] Tennaro also contends that the comments made by some of his superiors about his age belie defendants' claim that their decision was age-neutral.

Citing *Johansen*, 568 N.E.2d at 615, defendants assert that occasional references to Tennaro's age are insufficient to overcome their stated legitimate reasons. The *Johansen* case, however, merely held that "[s]tray remarks suggestive of impermissible bias do not constitute the sort of evidence that places a case in the mixed motive category...." *Id.* In a mixed motive case, i.e., "when it has been shown that an employment decision resulted from a mixture of legitimate and illegitimate motives ..." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 232, 109 S.Ct. 1775, 1781, 104 L.Ed.2d 268 (1989), the employer has the burden of proving that "its legitimate reason, standing alone, would have induced it to make the same decision." *Id.* at 252, 109 S.Ct. at 1792. *Johansen* is, therefore, inapposite in this case in which the parties agree that the evidentiary framework set forth in *McDonnell Douglas*, not that in *Price Waterhouse*, applies.

Although, summary judgment is not *per se* inappropriate "when elusive concepts like motive or intent are in play," *Pagano v. Frank*, 983 F.2d 343, 347 (1st Cir.1993), courts must be "particularly cautious" in granting summary judgment in such situations. *Stepanischen v. Merchants Despatch Transp. Corp.*, 722 F.2d 922, 928 (1st Cir. 1983). In the present case, the Court concludes that Tennaro has presented sufficient evidence, to wit: the remarks by his superiors concerning his age, to raise a genuine issue as to whether defendants' proffered reason for the termination is merely pretextual. The Court, therefore, will deny the motion of defendants (except Ryder) for summary judgment with respect to Count I and Count III insofar as it alleges age discrimination.

### C. Civil Conspiracy

■ Count III may also be read as alleging a claim of civil conspiracy against the individual defendants. In Count III, Tennaro asserts that the individual defendants "acted in concert with the intent of falsely accusing Tennaro of improper acts so that Tennaro would be wrongfully terminated" and that "[the] individual defendants, acting together, possessed and exerted coercion in bringing these false charges against Tennaro." Complaint at ¶ 26 and 27.

■ "Civil conspiracy is a very limited cause of action in Massachusetts." *Jurgens v. Abraham*, 616 F.Supp. 1381, 1386 (D.Mass. 1985). In order to prevail on a claim of civil conspiracy, a plaintiff must prove that "defendants, acting in unison, had 'some peculiar power of coercion' over plaintiff that they would not have had if acting independently." *Id.* (quoting *Fleming v. Dane*, 304 Mass. 46, 22 N.E.2d 609, 611 (1939)). Evidence of mere joint tortious activity by defendants is insufficient to prove civil conspiracy. *Norman v. Brown, Todd & Heyburn*, 693 F.Supp. 1259, 1265 (D.Mass.1988).

Tennaro has failed to produce evidence that the individual defendants, by virtue of joint activity, possessed any peculiar power of coercion over him. Thus, defendants' motion for summary judgment as to Count III will be allowed insofar as it alleges civil conspiracy.

### D. Intentional and Negligent Infliction of Emotional Distress

Count IV(1) alleges that M & G (and Ryder) intentionally and/or negligently inflicted emotional distress on Tennaro by failing to conduct a proper investigation of the facts underlying his Complaint and by failing to protect him from the wrongful and intentional acts of its agents. M & G contends that both the intentional and negligent infliction of emotional distress claims are barred by the exclusivity provision of the Massachusetts workers' compensation statute. *See* M.G.L. c. 152, § 24.

M.G.L. c. 152, § 24 provides, in pertinent part:

---

ination. The amendment eliminated that reference and inserted paragraph 1B.

**4.** The reason offered for Tennaro's termination on December 8 was his alleged derogatory statements about the company.

**500**

An employee shall be held to have waived his right of action at common law or under the law of any other jurisdiction in respect to an injury that is compensable under this chapter, to recover damages for personal injuries, if he shall not have given his employer ... written notice that he claimed such right ...

Tennaro does not allege that he notified M & G of his intention to retain his common law rights. Thus, Tennaro has waived his common law rights with respect to any injuries compensable under the workers' compensation statute.

### 1. Intentional Infliction of Emotional Distress

■ Injuries arising out of intentional torts, including intentional infliction of emotional distress, committed in the course of the employment relationship, are compensable under Chapter 152. *See Anzalone v. Massachusetts Bay Transp. Auth.*, 403 Mass. 119, 526 N.E.2d 246, 249 (1988); *Mullen v. Ludlow Hosp. Soc.*, 32 Mass.App.Ct. 968, 592 N.E.2d 1342, 1345, *further appellate review denied*, 413 Mass. 1103, 598 N.E.2d 1133 (1992). Injuries stemming from a supervisor's exercising his or her supervisory duties are considered to arise in the course of the employment relationship. *Anzalone*, 526 N.E.2d at 249; *Mullen*, 592 N.E.2d at 1345.

As in *Anzalone* and *Mullen*, the activities on which Tennaro bases his claim for intentional infliction of emotional distress relate to the manner in which his superiors exercised their supervisory duties. *See Anzalone*, 526 N.E.2d at 249; *Mullen*, 592 N.E.2d at 1345. Consequently, any emotional injury suffered by Tennaro arising out of such activities is compensable under the workers' compensation statute, and any common law action based on such an injury is barred by the exclusivity provision of that statute. Therefore, the Court will allow defendants' motion for summary judgment with respect to Tennaro's claim for intentional infliction of emotional distress.

### 2. Negligent Infliction of Emotional Distress

■ Tennaro contends that his claim for negligent infliction of emotional distress is not compensable under the workers' compensation statute, and, therefore, is not barred. The Supreme Judicial Court of Massachusetts ("S.J.C.") has held: "[It is] clear that recovery may be had under the compensation act for injuries of a mental or emotional nature." *Foley v. Polaroid Corp.*, 381 Mass. 545, 413 N.E.2d 711, 714 (1980). Subsequent to *Foley*, the legislature amended M.G.L. c. 152, §§ 1(7A) and 29. By virtue of those amendments, unintentionally inflicted "emotional disability arising principally out of a bona fide personnel action (such as termination of employment) was expressly excluded as a compensable injury under the workers' compensation statutes." *Mullen*, 592 N.E.2d at 1345; M.G.L. c. 152, § 1(7A), as amended by St.1985, c. 572, § 11 and M.G.L. c. 152, § 29, as amended by St.1985, c. 572, § 38. The legislature's decision to exempt such emotional disabilities from the definition of "personal injury" under Chapter 152 followed on the heels of *Kelly's Case*, 394 Mass. 684, 477 N.E.2d 582 (1985), in which the S.J.C. permitted compensation for emotional injuries incurred by an employee after her employer made a good faith decision to transfer her.

In the case at bar, Tennaro does not claim that his emotional distress was caused principally by M & G's bona fide decision to terminate him. Rather, he contends that the distress was brought on by a series of incidents, beginning with O'Neil's statement: "You took your best shot baby. Now it's my turn," and culminating with the allegedly improper termination. Tennaro sought treatment for emotional distress shortly after the O'Neil statement, months before his termination. Because his emotional disability did not arise principally out of a bona fide personnel action, the amendments to M.G.L. c. 152, §§ 1(7A) and 29 are inapplicable to the case at bar.[5] Tennaro's claim, characterized as one for negligent infliction of emotional

**5.** *See* Locke, 29 *Massachusetts Practice:* Workmen's Compensation, § 10.5 at 143 (1990 Supp.).

distress, remains compensable under the workers' compensation statute, and, as a result, is barred.[6]

### E. Assault and Battery

Count IV(2) of Tennaro's Complaint alleges that the actions of O'Neil, Ervin and Vallente in Tennaro's office on December 8, 1989 constituted assault and battery. In Count V, Tennaro contends that M & G is vicariously liable for the alleged assault and battery. As stated above, intentional torts committed in the course of the employment relationship are compensable under the Massachusetts workers' compensation statute, M.G.L. c. 152. *See Anzalone*, 526 N.E.2d at 249. With exceptions inapplicable here, common law actions based on such torts are thus barred by the exclusivity provisions of that statute. *Id.* Tennaro does not contend that the alleged assault and battery occurred outside the employment relationship. In fact, in his opposition to defendants' motion for summary judgment, Tennaro appears to concede that the claims based on the alleged assault and battery are barred. *See* Tennaro's Opposition to Defendants' Motion for Summary Judgment and Memorandum of Reasons at 10. Thus, the Court will allow defendants' motion for summary judgment with respect to Counts IV(2) and V.

### F. Breach of Employment Contract

■ In Count VI of his Complaint, Tennaro alleges that by terminating him without cause in either December, 1989 or January, 1990, M & G breached an implied contract of employment running from June 1989 to June 1990. Tennaro bases that claim on M & G's practice of reviewing his performance every April and routinely giving him a raise every June.

Massachusetts Courts have long held that "[a]s a general rule, where an employment contract, be it express or implied, contains no

definite period of employment, it establishes employment at will ... terminable by either the employee or the employer without notice, for almost any reason or for no reason at all." *Jackson v. Action for Boston Com. Dev.*, 403 Mass. 8, 525 N.E.2d 411, 412 (1988). (Citations omitted). Whether an employment contract contains a definite period of employment "depends upon all the attendant conditions surrounding the agreement, as well as upon its terms, when the latter are not specific and clear." *Kravetz v. Merchants Distributors, Inc.*, 387 Mass. 457, 440 N.E.2d 1278, 1280 (1982) (quoting *Maynard v. Royal Worcester Corset Co.*, 200 Mass. 1, 85 N.E. 877, 878 (1908)).

In support of his contract claim, Tennaro relies solely on M & G's annual practice of giving him a salary increase in June and Russell's statement, made at a seminar in 1988, that Tennaro would have a good future with the company if he had a law degree. Merely establishing an agreement as to an annual rate of pay, however, is insufficient to create a contract for a definite term. *See Frederick v. Conagra, Inc.*, 713 F.Supp. 41, 45–46 (D.Mass.1989) (confirmatory letter offering a starting salary of $60,000 annually with an interest free loan to be forgiven after the completion of two years of employment "ordinarily would not suffice to create a contract for a specific term of years."); *Lowenstein v. President and Fellows of Harvard College*, 319 F.Supp. 1096, 1097–1098 (D.Mass.1970). Moreover, Russell's statement, unrelated as it was to the contract that Tennaro alleges ran from June to June, does not save the day for Tennaro. The Court concludes, as a matter of law, that Tennaro was an employee at will and that his breach of employment contract claim must therefore fail.

### G. Wrongful Termination

In Count VII of the Complaint, Tennaro alleges that he was wrongfully terminated by

---

6. Tennaro contends that *Ferriter v. Daniel O'Connell's Sons, Inc.*, 381 Mass. 507, 413 N.E.2d 690 (1980), provides support for his contention that a claim for negligent infliction of emotional distress is not compensable under the act, and, therefore, is not barred. *Ferriter*, however, involved a claim of negligent infliction of emotional distress brought by members of an injured employee's family who suffered mental anguish as a result of observing the injured employee. 413 N.E.2d at 703. The Court, in *Ferriter*, expressly distinguished between claims of family members, which were not at that time barred by the exclusivity provisions of the workers' compensation statute, and claims of employees. *Id.* at 697–703. As such, *Ferriter* is inapposite.

M & G. Tennaro correctly argues that there is a limited public policy exception to the doctrine that an at will employee may be fired for any reason or for no reason. Massachusetts courts have permitted redress for at will employees "who are terminated for asserting a legally guaranteed right (e.g., filing workers' compensation claim), for doing what the law requires (e.g., serving on a jury), or for refusing to do that which the law forbids (e.g., committing perjury)." *Smith–Pfeffer v. Fernald State School,* 404 Mass. 145, 533 N.E.2d 1368, 1371 (1989).

Tennaro contends that a fact finder could conclude that he was terminated for refusing to do that which the law forbids. He bases that contention on the fact that he expressed concern over M & G's use of trucks that were longer than the law allowed, a practice, which, according to Tennaro, was well known within the company. Tennaro expressed his concerns to management about the possibility of drivers losing their licenses if the practice continued. In the late spring or early summer of 1989, M & G ceased using overlong trucks.

Tennaro's argument that a fact finder could infer that he was fired for refusing to do that which the law forbids is, however, unpersuasive, because Tennaro did not, in fact, refuse to break the law. To the contrary, he stated in his deposition:

> I think I expressed from the beginning that I was uncomfortable with [the practice of running overlong trucks]. But, [Doerfler is] the boss. And, whatever the boss says, as a loyal employee I'm gonna do what he says.

Tennaro deposition at 66. Because Tennaro's wrongful discharge claim does not come within the narrow public policy exception to the at will employee doctrine, the Court will allow defendants' motion for summary judgment with respect to Count VII insofar as it alleges wrongful termination.

### H. Interference with Pension Rights

 Tennaro also alleges in Count VII that his termination constitutes interference with his pension rights. The Supreme Court has made it clear that such a claim, to the extent it is based on state law, is preempted by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1144(a). *See Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 138–143, 111 S.Ct. 478, 482–485, 112 L.Ed.2d 474 (1990).

 To the extent that Count VII can be read as asserting a claim under § 510 of ERISA, 29 U.S.C. § 1140, it cannot withstand summary judgment. Section 510 provides, in pertinent part:

> It shall be unlawful for any person to discharge ... a participant ... for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan ...

To prevail in a claim under § 510, Tennaro must prove that M & G discharged him with the specific intent of interfering with his pension rights. *See Biggins v. Hazen Paper Co.,* 953 F.2d 1405, 1416 (1st Cir.1992), *vacated on other grounds,* — U.S. ——, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993).

The only evidence offered by Tennaro with respect to his pension claim is that: 1) he participated in M & G's pension plan and 2) M & G's contributions to the plan increased as Tennaro's length of service and salary increased. It is undisputed, however, that Tennaro was fully vested in the plan. Evidence that the pension plan's formula for determining employer contributions takes into account length of service and salary does not constitute the requisite showing that, in firing Tennaro, M & G had the specific intent to interfere with his pension rights. Defendants' motion for summary judgment on Count VII will, therefore, also be allowed insofar as it alleges interference with pension rights.

### I. Interference with Advantageous Relationship

 Tennaro asserts in Count VIII that the individual defendants interfered with his beneficial relationship with M & G. The S.J.C. has recently addressed the issue of when an employee can successfully claim that a supervisor intentionally interfered with the employee's advantageous relationship with an employer. *See Boothby v. Texon, Inc.,* 414 Mass. 468, 608 N.E.2d 1028, 1040 (1993).

Actions taken by an employee's supervisor within the scope of employment are privileged, as long as the actions are not taken with actual malice. *Id.* Massachusetts courts have defined actual malice or malevolence as the taking of an action "for a spiteful, malignant purpose, unrelated to the legitimate corporate interest." *Wright v. Shriners Hosp. for Crippled Children,* 412 Mass. 469, 589 N.E.2d 1241, 1246 (1992) (quoting *Sereni v. Star Sportswear Mfg. Corp.,* 24 Mass.App.Ct. 428, 509 N.E.2d 1203, 1206 (1987)). There is no bright line rule by which to determine whether a supervisor, in taking an action, possessed actual malice. *Boothby,* 608 N.E.2d at 1040.

In the present case, there is a genuine issue as to whether the individual defendants acted with actual malice in bringing about the termination of Tennaro. Defendants argue that there is insufficient evidence to establish a causal connection between Tennaro's firing and the actions of three of the individual defendants—O'Neil, Vallente and Ervin. The roles of those defendants with respect to Tennaro's termination are, however, far from clear. Consequently, summary judgment is inappropriate on Count VIII.

### ORDER

For the foregoing reasons, it is hereby ORDERED that defendants' motion for summary judgment is allowed, in part, and denied, in part, as follows:

1. with respect to the Counts in which Ryder is named, the motion is **ALLOWED;**
2. with respect to Counts IV(1), IV(2), V, VI and VII, the motion is **ALLOWED;**
3. with respect to Count III, insofar as it alleges a claim of civil conspiracy, the motion is **ALLOWED;**
4. with respect to Count I, Count VIII and Count III, insofar as it alleges a claim under M.G.L. c. 151B, the motion is **DENIED.**