894 F.2d 50
 51 Fair Empl.Prac.Cas. 1360,
52 Empl. Prac. Dec. P 39,582, 58 USLW 2463
 Pearl SIEGEL, Plaintiff-Appellant,
v.
ALPHA WIRE CORPORATION, a New Jersey Corporation and Philip
R. Cowen, individually and in his capacity as
President and Chief Executive Officer of
Alpha Wire Corporation,
Defendants-Appellees.
 No. 89-5674.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 8, 1990.
Decided Jan. 12, 1990.
 
 Patrick M. Stanton (argued), Sandra L. Bograd, and Stephanie Whitecotton, Shanley & Fisher, P.C., Morristown, N.J., for plaintiff-appellant.
 Michael A. Lampert (argued) and Bruce H. Gieseman, St. John, Oberdorf, Williams Edington & Curtin, Newark, N.J., for defendants-appellees.
 Before GIBBONS, Chief Judge, and SCIRICA, Circuit Judge, and WALDMAN,* District Judge.
 OPINION OF THE COURT
 GIBBONS, Chief Judge:
 
 
 1
 Pearl Siegel appeals from a summary judgment in favor of her former employer, Alpha Wire Corporation ("Alpha") and Philip R. Cowen, Alpha's President and Chief Executive Officer, in her action alleging that the defendants terminated her employment with Alpha in violation of the federal Age Discrimination in Employment Act ("ADEA"), 29 U.S.C.A. Secs. 621-34 (West 1985 and Supp.1989). Siegel also alleged pendent causes of action under the New Jersey Law Against Discrimination, N.J.S.A. Sec. 10:5-1 et seq., as well as ten state common law grounds. In an amended answer, the defendants asserted state-law counterclaims based on information they learned during discovery.
 
 
 2
 The district court granted the defendants' motion for summary judgment and, because there is no diversity of citizenship in this case, dismissed Siegel's pendent state-law claims and the counterclaims. We will reverse.
 
 I.
 
 3
 Siegel is a citizen and resident of New Jersey. Alpha is a New Jersey corporation with its principal place of business in Elizabeth, New Jersey. Philip Cowen is a citizen and resident of New York.
 
 
 4
 Siegel was employed by Alpha from August 30, 1966 until she was fired on February 18, 1987. At the time of her termination, she was 63 years old. Siegel's first position with Alpha was as a clerk. She worked her way to the position of Senior Buyer, which she held for three and a half years before she was fired. At the time she was discharged, her job included purchasing requisitioned supplies, and assisting in the selection of appropriate vendors. She also administered a program under which the company leased automobiles, and maintained a list of employees who would thereafter purchase the automobiles from Alpha.
 
 
 5
 Siegel alleges that she was replaced by Jay Surujnath, a twenty-nine year old maintenance clerk with no experience in the purchasing area. In their answer to interrogatories, the defendants state that her duties were spread between Surujnath and another employee, Phillip Hanna, who was forty years old and had a college degree in marketing. (App. 212).
 
 
 6
 In July 1986, defendant Philip R. Cowen became Alpha's president and chief executive officer. Cowen stated that, during 1985 and 1986, Alpha's "sales, earnings, market share and employee morale had deteriorated significantly." He also stated that "Alpha sustained losses in each of those years and, by mid-1986 was in default under its bank loan agreements." (App. 181).
 
 
 7
 On February 18, 1987, Siegel was terminated at the direction of Cowen by her immediate supervisor, then Director of Purchasing for Alpha, Edward Czerniawski. Czerniawski allegedly told Siegel that "Cowen wants you out now. He wants to upgrade the position." (App. 163-64).
 
 
 8
 Siegel relies on the deposition testimony of Czerniawski, who stated that she received good evaluations during her employment, that she was "better than average" in ability, and that she was a "highly motivated individual." (App. 184). Czerniawski also testified that at no time did he find that Siegel's job skills were waning. (App. 185).
 
 
 9
 Siegel testified about Cowen that, although he never said so to her, "it was a noted fact throughout the company that he--like he said, that being older is no percentage for the company, that he wanted younger people, that they were swifter." (App. 162A).
 
 
 10
 Siegel contends that Cowen used the phrase "old dogs don't know how to hunt" and that this indicates age bias. Czerniawski also testified that Cowen used the expression, in connection with "[s]ome of the senior people at Alpha Wire who were associated with the previous management". (App. 189). Cowen responded by stating that he uses the phrase "that dog won't hunt", which is a Texan expression which "refers to a losing proposition" and has nothing to do with age. Cowen is from Texas. (App. 83).
 
 
 11
 After the initiation of this litigation, Cowen offered his reasons for firing Siegel. He claimed that Siegel's termination was part of a plan to reverse Alpha's declining profits by discharging incompetent employees, stating that he "lost confidence in her ability and loyalty to the corporation". (App. 81-83). One of the reasons for this loss of confidence was an occasion when he asked Siegel to provide him with the name and address of a company which supplied goods to Alpha, as he wanted to purchase something for himself from that company. Siegel responded by offering to have Alpha's carpenter manufacture an item using goods from Alpha's stock. Cowen stated that this incident caused him to doubt Siegel's loyalty to Alpha. (App. 82).
 
 
 12
 Cowen gave as an additional reason for his loss of confidence in Siegel the fact that he was informed by Alpha's corporate controller that Siegel had participated in a scheme whereby company automobiles were being "authorized for sale by Alpha to a select group of employees in violation of Alpha's policies, with unauthorized repairs being done prior to sale, and without competitive bidding, at prices below the fair market value." (App. 82).
 
 
 13
 Siegel argues that the fact that eight individuals within the protected age group were fired during the first three months of 1987 is indicative of age discrimination. In response to an interrogatory asking for information about employees discharged or demoted within the past three years, the defendants submitted a list of twenty-three individuals, twelve of whom were in the age group protected by the ADEA, and eleven of whom were not. It is unclear on what date the interrogatory was answered. (App. 209-212). The defendants also point to a log of 'Terminated Employees--Layoffs' which shows that from the period from July 1986 to April 1987, fifty-four employees were terminated, only 18 of whom were in the age group protected by the ADEA. (App. 230-34).
 
 
 14
 Alpha's financial statements for 1985 and 1986 show losses of $84,000 and $1,436,000 respectively. Siegel relies on testimony in a related age-discrimination suit against Alpha to suggest that Alpha's financial situation was not as dire as Cowen asserts. In the related case, a former vice-president and chief financial officer of Alpha, Anthony Damiano, testified that Alpha's financial picture was healthier than portrayed by Cowen and by the company's financial statements. Damiano testified that the loss of $1,436,000 on Alpha's financial statement for the fiscal year 1985-1986 was made up of three items: i) the present value of future payments under a contract with the former president; ii) a "provision made for certain assets which were deemed to be not usable in the corporation," which was made part of the financial statements "at the direction of Mr. Phil Cowen."; and iii) a charge "called relocation expenses" which in Damiano's opinion were amounts spend on the "relocation of Mr. Phil Cowen from Dallas". (App. 173). He also testified that the loss appearing on the 1986 statement was increased because the company changed its accounting methods in 1986. Damiano stated that, if these "unusual" items had not been included in the statements, and the accounting methods had not been changed, Alpha's books would have shown a gain of $448,000 for that year. (App. 174).
 
 II.
 
 15
 The analytical framework for ADEA claims is by now familiar. A plaintiff has the initial burden of establishing a prima facie case, which, if credited, raises an inference of unlawful discrimination. Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). To do so, a plaintiff must establish (1) that she was a member of the class protected by the ADEA, (2) that she was qualified for the position from which she was discharged, (3) that she was discharged despite those qualifications, and (4) that the position was then filled by a person sufficiently younger to permit an inference of age discrimination. Healy v. New York Life Ins. Co., 860 F.2d 1209, 1214 (3d Cir.1988).
 
 
 16
 If the plaintiff establishes a prima facie case, the burden of production then shifts to the defendant to articulate a "legitimate, non-discriminatory reason" for its action, which will dispel the presumption of discrimination inherent in a prima facie case.[1] McDonnell-Douglas, 411 U.S. at 802, 93 S.Ct. at 1824. If the defendant succeeds, the plaintiff (who at all times retains the burden of ultimate persuasion) must prove by a preponderance of the evidence that the reasons articulated by the defendant for its actions were not the true reasons. Bruno v. W.B. Saunders Co., 882 F.2d 760, 764 (3d Cir.1989); Sorba v. Pennsylvania Drilling Co., 821 F.2d 200, 202 (3d Cir.1987), cert. denied, 484 U.S. 1019, 108 S.Ct. 730, 98 L.Ed.2d 679 (1988).
 
 
 17
 To withstand a motion for summary judgment, however, a plaintiff need not, of course, actually carry this burden. A trial court may enter summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Chipollini v. Spencer Gifts, Inc., 814 F.2d 893, 896 (3d Cir.) (in banc), cert. dismissed, 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987).[2]
 
 
 18
 To defeat a summary judgment motion based only on a defendant's proffer of a nondiscriminatory animus, a plaintiff who has made a prima facie showing of discrimination, need only point to evidence establishing a reasonable inference that the employer's proffered explanation is unworthy of credence.
 
 
 19
 Sorba v. Pennsylvania Drilling Co., 821 F.2d 200, 205 (3d Cir.1987), cert. denied, 484 U.S. 1019, 108 S.Ct. 730, 98 L.Ed.2d 679 (1988). The plaintiff is not required to produce evidence which "necessarily leads to the conclusion that the employer did not act for discriminatory reasons." Id.
 
 
 20
 In this case, the district court held that Siegel had produced sufficient evidence to establish a prima facie case of age discrimination, because there was no dispute as to the fact that Siegel was in the protected age category and that she was terminated and replaced by one individual more than thirty years younger and another individual twenty-three years younger. The defendants disputed that Siegel was performing her job satisfactorily at the time of her discharge, pointing to the alleged instances of her disloyalty to Alpha articulated by Cowen. The district court held nevertheless that these instances did not negate Siegel's showing that she had received satisfactory performance ratings during her twenty-one years of employment with Alpha, and Czerniawski's testimony that Siegel was a "better than average employee." (App. 14-15).
 
 
 21
 The court went on to hold that the defendants had proffered legitimate business reasons for Siegel's discharge, stating, with respect to the two alleged instances of Siegel's disloyalty:
 
 
 22
 Whether or not Siegel believed her actions to be proper, and she believes they were, Cowen believed them to be improper. As a result, he became convinced that she was not a suitable employee at a time when termination decisions were being made with the goal of company survival.... Cowen is entitled to exercise his business judgment in making a decision to terminate, whether he is eventually proven to have been right or wrong, as long as he harbors no discriminatory animus in doing so.
 
 
 23
 (App. 15).
 
 
 24
 The court then held that Siegel had failed to produce evidence which, if credited, would show by a preponderance of evidence that Cowen's proffered reasons were merely a pretext for discrimination. The court stated: "Cowen's use of the phrase 'old dogs won't hunt' does not create a reasonable inference that Siegel was terminated for reasons other than legitimate business reasons," because the only admissible evidence regarding Cowen's use of the phrase came from Czerniawski, who testified only that Cowen used the phrase in connection with two employees other than Siegel. Thus, the court determined, "Czerniawski's testimony concerning the phrase itself and the context in which it was used by Cowen does not even suggest that Cowen was referring to individuals forty years of age or older in general or Siegel in particular--and he was a fan of Siegel, not of Cowen." (App. 18).
 
 
 25
 The court also decided that Czerniawski's testimony that Cowen directed him to fire Siegel in order to "upgrade" the position did not raise an inference that Cowen's later articulated reasons were pretextual. The court stated that if Cowen believed he had grounds to fire Siegel, the replacement of her "would, almost by definition, be, at least in his view, an upgrade of the position." (App. 19).
 
 
 26
 Finally, the court held that Siegel's evidence as to the termination of eight other individuals in the protected age group during the first three months of 1987 did not establish a pattern of discharge of older employees. The court noted that the exhibit to which Siegel referred for this evidence showed that twelve individuals within the protected age group were fired between July 1986 and December 1987, but also that eleven individuals outside the protected age group were fired. This, the court stated was "not statistically significant." (App. 19-20).
 
 III.
 
 27
 We agree with the district court that Siegel successfully made out a prima facie case of age discrimination. Defendants attempt to argue that this holding was erroneous because Cowen "has declared that his business decision to terminate Siegel was not motivated by a discriminatory animus", and "[t]o meet this evidence Siegel has presented only stale performance evaluations." (Brief for Appellees at 20). This argument, however, goes to the issue of whether the defendants have demonstrated a legitimate business reason for the discharge and whether Siegel can demonstrate that this reason is pretextual, not to the initial question of whether Siegel made out a prima facie case.
 
 
 28
 The district court correctly held that Siegel's age, the fact that she was replaced by one or two significantly-younger individuals, her satisfactory performance ratings, and Czerniawski's testimony that she was a "better than average" employee, all establish a prima facie case.
 
 IV.
 
 29
 When reviewing a grant of summary judgment, an appellate court is required to apply the same standards as the District Court. Chipollini, 814 F.2d at 896; Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir.1976), cert. denied, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). Thus, the question we must resolve is whether Siegel has produced enough evidence to support an inference that the reasons articulated by Cowen for her discharge are pretextual.
 
 
 30
 This case is a close one, but we believe that the grant of summary judgment was erroneous. If a jury were to credit Siegel's evidence that Cowen more than once used the phrase "old dogs won't hunt", this, along with the fact that she had received good evaluations from Czerniawski and that Cowen articulated the reasons now alleged to be his motivation for firing Siegel only after she filed suit, could support a verdict in her favor. This is all that need be determined for Siegel to withstand the defendant's motion for summary judgment.
 
 
 31
 Rather than examining the evidence and determining whether or not it could reasonably support a jury finding of pretext, however, the district court drew a number of inferences from the evidence, resolving for itself issues which should properly have been left to a jury to decide. As did the district court in Chipollini, supra, the trial court here "erred in weighing competing inferences and in resolving disputed facts." 840 F.2d at 900.
 
 
 32
 For example, the court decided that Czerniawski's testimony concerning the phrase "old dogs won't hunt" and the context in which it was used "does not even suggest" that Cowen was referring to individuals in the protected age group. (App. 18) (emphasis added). To the contrary, a jury could find that Czerniawski's testimony that Cowen used that phrase when referring to "[s]ome of the senior people at Alpha Wire who were associated with the previous management" indicated a bias against older employees. Of course, a jury could also decide, as did the district court, that the phrase only indicated dissatisfaction with employees associated with the previous management of Alpha, but this is precisely the sort of question which must be left to the jury.
 
 
 33
 In addition, the court determined that Czerniawski's testimony that Cowen directed him to fire Siegel in order to "upgrade" the position was not inconsistent with his proffered reasons for discharging her. (App. 19). Whether or not upgrading a position is consistent with discharging an employee for disloyalty and incompetence, however, is again a question for a jury to decide.
 
 
 34
 As this court reaffirmed in Chipollini, a plaintiff may meet her burden of showing that a defendant's proffered reason is "merely a fabricated justification for discriminatory conduct.... 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered reason is unworthy of credence.' " 814 F.2d at 898 (quoting Burdine, supra, 450 U.S. at 257, 101 S.Ct. at 1096). Siegel places emphasis on the fact that Cowen stated only that he wanted to upgrade the position at the time she was fired and alleged that she showed disloyalty only after this case was filed, maintaining that this indicates that the latter reasons are not the real ones. She also argues that the exaggeration of Alpha's financial problems supports an inference that she was not fired for incompetence.
 
 
 35
 While post hoc explanations do not by themselves create a factual dispute about whether an explanation is pretextual, Healy v. New York Life Ins. Co., 860 F.2d 1209, 1215 (3d Cir.1988), inconsistencies in performance evaluations prior and subsequent to an employee's termination may support an inference of pretext. See, e.g., Gunby v. Pennsylvania Electric Co., 840 F.2d 1108, 1117 (3d Cir.1988), cert. denied, --- U.S. ----, 109 S.Ct. 3213, 106 L.Ed.2d 564 (1989). Czerniawski's good evaluation of Siegel, together with an alleged remark by Cowen early in their acquaintance that, "if I had ten more Pearls I'd have it made", (App. 153), could be found by a jury to indicate that the reasons later given for her discharge--offered as they were in the face of an age-discrimination suit--were pretextual.
 
 
 36
 The district court stated that Siegel's proffered evidence as to the discharge of other employees was "not statistically significant". As the court correctly noted, however, this is not a disparate impact case. Siegel appears to rely not so much on pure statistical evidence, but more on the specific circumstances of individual instances of employees being discharged, alleging that there is "a series of terminations and rehirings that are highly indicative of age discrimination." (Reply Brief for Appellant at 6). She asserts that the termination of a number of senior employees in the protected age group and associated with the previous management of Alpha indicates that they and she were discharged because of age-discrimination. This may not be a particularly strong argument, but, as already stated, Siegel has put forward enough evidence to warrant her case going to a jury, and this may have some relevance.
 
 
 37
 Likewise, Siegel's argument that Cowen's alleged manipulation of financial statements was to "provide a smokescreen for his discriminatory practices", (Reply Brief for Appellant at 8), may not ultimately be convincing, but that is a question which, in light of the other evidence offered by Siegel, must be determined by a jury.
 
 V.
 
 38
 Because summary judgment was inappropriate in this case, we will direct that the pendent state law claims dismissed by the district court be reinstated. The defendants themselves requested that, if this court determined that summary judgment should not have been granted, the state claims and counterclaims be "returned to the district court because they were the subject of motions to dismiss or for summary judgment that [the district court] did not rule on." (Brief for Appellees at 21).
 
 VI.
 
 39
 For the foregoing reasons, the judgment of the district court will be reversed, and the case remanded for further proceedings, with directions for the district court to reinstate Siegel's pendent state-law claims and the defendants' counterclaims.
 
 
 
 *
 Hon. Jay C. Waldman, United States District Judge for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 A defendant's articulation of a legitimate reason for her actions does not mean that a plaintiff's prima facie case has no further significance. It merely dispels any presumption of discrimination. As the Supreme Court stated:
 A satisfactory explanation by the defendant destroys the legally mandatory inference of discrimination arising from the plaintiff's initial evidence. Nonetheless, this evidence and inferences properly drawn therefrom may be considered by the trier of fact on the issue of whether the defendant's explanation is pretextual.
 Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 255 n. 10, 101 S.Ct. 1089, 1095 n. 10, 67 L.Ed.2d 207 (1981).
 
 
 [2]
 The defendants argue that we should overrule Chipollini. Of course we do not have the power to do so--a panel of this court may not overrule a decision of another panel. In addition, Chipollini was decided by this court sitting in banc, which makes doubly frivolous this invitation to overrule it