**George R. WARD, Plaintiff,**

**v.**

**WESTVACO CORPORATION, Defendant.**

**Civ. A. No. 92–30090–MAP.**

United States District Court,
D. Massachusetts.

July 6, 1994.

*MEMORANDUM REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT*

PONSOR, District Judge.

## I. INTRODUCTION

In this employment discrimination case, plaintiff George R. Ward ("plaintiff" or "Ward") has filed a five-count complaint against his former employer, Westvaco Corporation ("defendant" or "Westvaco") generally alleging (1) handicap discrimination under Mass.Gen.Laws ch. 151B, (2) age discrimination under Mass.Gen.Laws ch. 151B and its federal counterpart, the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et. seq.*, and (3) two counts of age and handicap discrimination under the Massachusetts Equal Rights Act under Mass.Gen.Laws ch. 93 § 103.

Defendant has moved for summary judgment offering three reasons why it is entitled to judgment as a matter of law. First, Westvaco maintains that Ward's age and handicap discrimination claims under Mass.Gen.Laws ch. 151B and the ADEA cannot withstand summary judgment because there is no evidence from which a reasonable factfinder could conclude that Ward's termination from Westvaco was motivated by discriminatory animus toward his age or handicap. Second, Westvaco contends that it is entitled to judgment as a matter of law on plaintiff's handicap discrimination claim under ch. 151B because it is undisputed that Ward was not a qualified handicapped person entitled to protection under the statute. Third, Westvaco asserts that plaintiff's claims of age and handicap discrimination under MERA must be dismissed because Mass.Gen.Laws ch. 151B is the exclusive remedy for employment discrimination claims.

For the reasons set forth below, the court will allow the defendant's motion as to the two MERA counts, but otherwise deny it.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to

Francis D. Dibble, Jr. and Carol E. Kamm, Bulkley, Richardson & Gelinas, Springfield, MA, for plaintiff.

Toby G. Hartt, Jay M. Presser, and Jeffrey C. Hummel, Skoler, Abbott & Presser, Springfield, MA, for defendant.

judgment as a matter of law." Fed.R.Civ.P. 56(c). The court must view the facts, and all reasonable inferences that may be drawn from them, in the light most favorable to the non-moving party, in this case the plaintiff. *Levy v. FDIC,* 7 F.3d 1054, 1056 (1st Cir. 1993).

The basic inquiry in a summary judgment motion is whether "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material facts and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.
>
> As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986) (Emphasis in original).

Once the moving party has carried its burden the non-moving party must point to at least one genuine issue of disputed fact. "Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Medina–Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990).

With these standards in mind, the court will now turn to plaintiff's claims of age and handicap discrimination.

### III.  FACTUAL BACKGROUND

Plaintiff was employed in the Envelope Division of Westvaco from 1966 until March 1, 1991. He was initially hired in 1966 as a sales representative and was promoted to the position of account executive in 1972. In 1985 Ward was transferred to the marketing department as a marketing specialist in the company's New Products unit, later renamed the "Consumer Products" department to more accurately reflect the focus of the department. As a marketing specialist, Ward's responsibilities included coordinating the marketing efforts of the Engineering, Manufacturing, and Sales Departments, providing support for the sales representatives, and implementing special marketing programs. *See* Plaintiff's Exhibit A to Affidavit of George Ward at 1; Defendant's L.R. 56.1 at ¶ 6. Ward was never involved in the initial stages of marketing a new product because by 1985, the year in which Ward was transferred, Westvaco had already introduced its last new product to the market. Instead, Ward concentrated on servicing existing accounts. He remained in this position until March 1, 1991, when he was terminated as part of Westvaco's reduction in force. At the time of his termination, Ward was fifty-three years old.

In 1978, while undergoing surgery to remove a brain tumor, plaintiff was diagnosed as suffering from retinitis pigmentosa ("RP"). RP is a degenerative eye disease which significantly affects a person's peripheral vision and in some persons can ultimately result in blindness. *See* Plaintiff's L.R. 56.1 at ¶ 1. While the symptoms vary from person to person, most people afflicted with RP suffer from poor vision, especially in poorly illuminated areas.

Ward's condition slowly deteriorated. He wore thick glasses to see more clearly and, because his peripheral vision had deteriorated, he often moved his head abruptly to see areas outside his field of vision. *Id.* at ¶¶ 2–3. Fortunately for plaintiff, his vision deteriorated rather slowly and as of January of 1991 his vision with glasses in his right eye was 20/40 and his left eye 20/50. The condition had mostly affected his field of vision— by 1991 his visual fields were restricted to approximately 10 degrees. Plaintiff maintains that although his vision slowed him down a bit, he compensated by working hard-

er and obtaining a stronger eye glass prescription that allowed him to see more clearly. *Id.* at 4. It is undisputed that Ward did not inform his supervisors of his condition until some time in 1991.

In 1988, plaintiff's manager Brian Lees evaluated Ward's overall performance as "provisional." In his summary, Lees concluded that

> over the past 12 months, George has not grown or been an asset in the Marketing Programs Department ... Compared to other individuals in similar positions, George tends to require an excessive amount of time to complete a project. Again, this may be due to his feeling "he knows best" and he does not follow instructions on how to move more quickly or more efficiently.

While recognizing that Ward got along well with his peers and "seems to try hard," Lees recommended that Ward be transferred to another position within the company. Defendant's Exhibit 17. Westvaco management never acted upon this recommendation.

In 1989, Patricia Crutchfield, a former marketing specialist at Westvaco, became the head of the New Products division and Ward's immediate supervisor. The New Products division was renamed the Consumer Products Division because by this time Westvaco was de-emphasizing new products. As a result, Crutchfield spent more time on consumer products marketing and less time on new products marketing. To facilitate this shift, Crutchfield had a Macintosh computer installed in the office to aid the marketing specialists in their preparation of advertisements, brochures and flyers touting the new products that were being marketed. Ward states that sometime in the fall of 1989, Crutchfield told him that he would become the Macintosh expert and would teach the other members of their department how to use the computer.

Instead of becoming the computer expert, Ward experienced great difficulty in mastering the Macintosh. During the training sessions, Crutchfield noticed that Ward had a problem seeing the computer screen and was constantly shifting his position to see more clearly. Crutchfield asked Ward if he had a vision problem and whether he wanted a tilt and swivel device to adjust the computer screen instead of moving around it. Ward told Crutchfield that his vision was fine as he had just acquired a new prescription for his eye glasses. He declined the offer for any apparatus to make the computer screen easier to read.

Because Ward's computer skills were substandard, Crutchfield suggested that he no longer use the Macintosh since it was not necessary to his perform his job. In her deposition, Crutchfield explained that the MacIntosh was merely a tool that could be used to enhance the design of the newsletters that plaintiff prepared for the department.

In an April 9, 1990 letter to her supervisor, Crutchfield addressed some problems with Ward's work style, but concluded with the following:

> I do not want to leave you with the impression that George is not making a contribution to the department—he is. He has consistently produced information and developed reports and newsletters to support our product lines, and I would be hard put to replace the persistence with which he approaches these necessary tasks. My point is that George's abilities are limited, and the department is now at a juncture where his weaknesses are having an impact on our ability to move forward and provide support to the sales force—our customers. For the most part, George has no problem doing what he's asked to do, as long as he has guidelines clearly spelled out for him. He seems, however, to have a great deal of difficulty when he is asked to generate a total package of ideas that must be developed, coordinated and connected within tight deadlines. Fortunately, he appears to be much more comfortable now that he is focused on tasks that generally require a steady, predictable course of action.

Plaintiff's Exhibit 11, April 9, 1990 letter to Reed from Crutchfield.

Six months later, in October of 1990, Crutchfield performed an in-depth review of Ward's performance. In this four page sin-

gle-spaced memo, Crutchfield notes the following about Ward's performance:

—I asked George, as I had during his 1989 review and during other discussions of his performance since then, if he was having any medical problems. He said that nothing was wrong with his health, that he had experienced "some trouble" with his eyes and that this problem was now corrected. He said that the problems with his eyes were what prevented him from successfully using the Macintosh during the previous six months. When I asked him specifically what the problems were, he said that they were corrected with new glasses. I dropped the subject, although I feel that George's job performance is limited by more than poor vision.

. . . .

—I have seen a deterioration in his ability to perform consistently without constant hands-on supervision to help him keep focused (even for day-to-day tasks that he repeats on a regular basis, such as monthly product reports). I have commented to DFR several times about my concern that George's abilities are limited, and his limitations are having a definite negative impact on our ability to more forward and provide timely, substantial, ongoing support for our consumer product lines. George is a poor match for the job this department needs done.

. . . .

George is a typical "nice guy," and I wish him well. But I can see that we are rapidly approaching the time when someone will have to bite the bullet and deal with his deteriorating performance.

After receiving this poor job performance, plaintiff alleges that Crutchfield subjected him to continued harassment, complained that he took too long to complete projects, made derogatory comments about his slowness in front of other employees, and constantly subjected him to an environment in which he was made to feel incompetent. Crutchfield's conduct, Ward asserts, was motivated by her animus against older employees and because of his eyesight problem.

In the beginning of January 1991, Westvaco met with the staff and informed them of an imminent reduction in force under which non-essential jobs would be eliminated. According to John Leahy, Manager of Personnel and Industrial Relations, as early as 1989 the company recognized that substantial reductions in the workforce, especially salaried employees, would be necessary to reduce costs and enhance Westvaco's future profitability. Leahy opined that failure to take these steps "may yield far more disastrous consequences." *See* Affidavit of John Leahy ("Leahy Aff.") at ¶ 5. Up until this point, Westvaco had not experienced a significant reduction in force for fifteen years. Now, even the Consumer Products Division was downsizing and channeling its energy into more profitable areas. In 1986 the department employed six marketing specialists. By 1991 only Crutchfield and Ward were left in the department.

Westvaco explained its procedures for eliminating positions as follows. First, managers of the individual departments were asked to evaluate the job functions of the members of the department without regard to individual performance. Accordingly, if a unique job was eliminated and all positions in that department were being laid off, then performance would not factor in the analysis. The only time an employee's performance was considered was when a particular employee was laid off but others holding the same position were retained. Second, Westvaco announced a no bumping policy. In other words, while an employee whose job was eliminated might be considered for a transfer to a vacant position, Westvaco would not allow employees with more seniority to bump those with less time on the job. *Id.* at 9.

On January 8, 1991, a few days after the reduction in force was announced, Crutchfield notified her supervisors that she was resigning from her position and that she would be leaving the company in the near future. Westvaco accepted her resignation and did not replace Crutchfield's position after her departure. *See* Defendant's L.R. 56.1 at ¶ 23.

On January 9, 1991, Ward met with Crutchfield and confided to her that he suf-

fered from RP. It is undisputed that, prior to this date, none of Ward's supervisors knew that the vision problem he suffered was caused by RP. Ward requested specific job accommodations which would help him perform better. Ward also expressed his fear of being targeted for a layoff because of Crutchfield's attitude about his condition. Crutchfield assured Ward that his handicap would not have any bearing on whether. he would be laid off.

A January 10, 1991 memorandum from Crutchfield to D.F. Reed, the Marketing manager for the Envelope Division of Westvaco, profiling Ward's performance notes the following:

> I have spoken to you informally several times during the past two years about my concerns for what I perceived as George's confusion and his limited abilities, and what I thought might be some kind of medical or physical problem. I have also tactfully and gently suggested to George on several occasions that he appeared to be troubled by such a problem, but he has always denied there was anything wrong. Yesterday (January 9), he told me that he has been suffering from retinitis pigmentosa for the past twelve years. George said he wanted the information taken into consideration so that he might avoid being "laid-off." He said that he was concerned that "management" perceived him as being "slow or not quite with it," and he wanted to let it be known, that he, in fact, has a problem which limits him. He admitted that his work "might be slow at times," but he feels that he can do certain jobs, that he could, for instance, continue to function in his Department. He also feels that he could do some sort of work on a computer, although he has no training in this area.

*See* Plaintiff's Exhibit 13.

This memo was followed by another dated January 17, 1991 in which Crutchfield forwarded a copy of a letter from Ward's ophthalmologist regarding his visual handicap. Plaintiff forwarded a copy of a letter he received on January 17, 1991, from the Massachusetts Commission for the Blind confirming that he was legally blind and also prepared and submitted a separate memoran-

dum addressing his concerns with his visual handicap. In this letter, Ward noted that for twenty-three years he had received good evaluations and performance reviews. He stated that his most recent performance rating, which was below average, was attributable to his handicap. Ward requested the following accommodations:

> —A larger display screen or perhaps different lighting, if I'm required to use a computer terminal.
>
> —A little more time may be needed to review a document.
>
> —A minimal amount of additional time may be needed to perform tasks requiring physical movement.

In this letter to Crutchfield and Reed, Ward stated that he was confident that these reasonable accommodations would enable him to perform at a superior level. He also expressed his desire to continue his employment at Westvaco stating that he would continue to put forth the maximum effort.

On January 18, 1991, Ward met with Reed and Crutchfield and again expressed his concerns about the upcoming RIF. Reed told Ward that the elimination of his position would not depend upon his performance ratings. Instead, the company would focus on the job functions of the position to determine whether the particular position was non-essential and thereby subject to the RIF. Reed also told Ward that, while he was aware of the fact that Ward wore eyeglasses, he had *no knowledge, prior to January 10th,* that he suffered from RP. Reed assured Ward that his RP would not factor into the decision making process.

On February 8, 1991, Reed notified Ward that, despite his visual handicap, his position was considered "non-essential" because the company was no longer introducing new products. On February 19, 1991, Ward and 47 other Westvaco employees were notified that they were terminated effective March 1, 1991. Because Ward's job duties were considered by Westvaco management "unique," they did not compare his performance with other marketing specialists who were not subject to the RIF. Ward was given 35 weeks severance pay, outplacement services,

and an option to continue his health insurance at the company's expense for a limited period of time.

On March 1, 1991, plaintiff applied for disability retirement benefits from the Social Security Administration and for disability retirement benefits under the Company's pension plan and long-term disability benefits. In a letter to his personal supervisor, Ward made the following notation:

> According to your letter to me of February 26, 1991, I must submit my Application for Disability Retirement by March 1, 1991 in order to qualify to collect disability retirement benefits.

> In order to meet this short deadline, I have prepared the application as instructed. However, my submission of this application and any statement made on it are not intended as a waiver by me of my position that I would have been able to continue to perform my duties as an employee of Westvaco if Westvaco had made reasonable accommodations for my disability.

> This letter should remain as a permanent attachment to my Application for Disability Retirement.

Presently, Ward is receiving approximately 70% of his salary from social security disability benefits and Westvaco's long-term and retirement disability benefits.

## IV. DISCUSSION

### A. Plaintiff's Claims for Handicap discrimination under Mass.Gen.Laws ch. 151B.

Massachusetts Gen.Laws chapter 151B provides that it shall be unlawful for an employer or his or her agent to discriminate against a qualified handicapped person who is capable of performing his or her essential job functions with reasonable accommodation. A "qualified handicapped person" is defined as "a handicapped person who is capable of performing the essential functions of a particular job, or who would be capable of performing the essential functions of a particular job with reasonable accommodation." *Cox v. New England Telephone & Telegraph Co.*, 414 Mass. 375, 381, 607 N.E.2d 1035 (1993).

*Cox* represents the S.J.C.'s first attempt to analyze a claim under 151B for handicap discrimination. *Id.* at 382, 607 N.E.2d 1035. In comparing the 151B handicap discrimination statute with section 504 of the Rehabilitation Act, 29 U.S.C. § 794, the S.J.C. opined that there was not a significant difference between the term "qualified handicapped person" language found in 151B and the term "otherwise qualified individual with handicaps" in section 504 of the federal statute. *Id.* at 384, 607 N.E.2d 1035. Under either law, the burden of proof rests with the plaintiff to prove that he or she is a qualified handicapped person.

Westvaco maintains that the decision to eliminate Ward's position was based solely on the fact that its Envelope Division ceased new product development in 1989 and not, as Ward alleges, on his poor job performance ratings.

In addition, defendant argues that summary judgment is appropriate on the handicap discrimination claim because plaintiff cannot prove he is a "qualified handicapped person." Westvaco argues that Ward was not qualified for his position as a marketing specialist because on March 1, 1991 Ward applied for and was later granted disability benefits. In his application for disability benefits from Westvaco, Ward prepared the following statement:

> (1) I became totally and permanently disabled by bodily injury or disease so as to be prevented from engaging in any occupation or employment for wage or profit whatever on or about (in plaintiff's handwriting) January 17, 1991, See attached letter to Gayle I. Fridkin dated March 1, 1994.

Westvaco argues that this admission conclusively proves that Ward was unable to perform his job duties as of January of 1991. Ward is therefore not a "qualified handicapped person" entitled to reasonable accommodation under Mass.Gen.Laws ch. 151B § 4(16).

In support of this position, Westvaco cites to a relatively recent First Circuit decision, *August v. Offices Unlimited, Inc.*, 981 F.2d 576 (1st Cir.1992). In that case, plaintiff

underwent treatment for depression after working as a sales representative for the company for approximately 23 years. In March of 1989, August's treatment for major depression required him to be out of work for several weeks. He then met with his supervisors in an attempt to extend his leave. During this meeting, August requested to work part time or miss certain sales presentations when he experienced the greatest side effects from his antidepressant medication. This request was denied by his supervisors, who then suggested to August that if he was unable to return to work due to his medical condition he should consider applying for disability benefits under the company's insurance plan.

August filed a claim of handicap discrimination alleging that this meeting with his supervisors was so stressful as to reactivate his depression. August claimed that because of his treatment by his supervisors during this meeting, he executed a claim application under the company's disability benefits plan stating that he was totally and completely disabled since March 24, 1989, the original date of his absence from his job. Each signed application for disability benefits by plaintiff claimed that he had been totally and completely disabled since March of 1989.

The district court granted the defendant's motion for summary judgment on the handicapped discrimination claim finding that August was not a "qualified handicapped person" under the statute. *Id.* at 579. In affirming the holding of the district court, the First Circuit relied on the undisputed fact that August was unable to perform his job. The court of appeals noted that it was undisputed that August was incapable of performing the essential functions of *any* job, let alone his position as a furniture salesman at defendant's store, from March 24, 1989 onward. The court pointed to the fact that August's own sworn statements in his applications for disability benefits declared that he was totally and completely disabled since March of 1989. The court added that at no time did August renounce the statements on his insurance forms, nor did he point to any fact which would suggest that he was not totally disabled during the relevant time period. August also failed to note on any disability form that his disability was caused or aggravated by the May 11th meeting with his supervisors. He showed no sign of intending to return to work. *Id.* at 581–83.

Westvaco maintains that the facts of this case fall squarely within the *August* decision and that it is entitled to summary judgment on plaintiff's handicap claim as a matter of law. However, unlike *August,* Ward explicitly stated in his application for disability benefits that he would have been able to perform his job had his employer made reasonable accommodations. In his application for social security disability benefits on March 7, 1991, Ward noted the following when asked to explain how his condition kept him from work: "I need good light to perform my work. My periphal (sic) vision [is] sharply reduced. I can't drive. Westvaco stated I was terminated because my job was eliminated." Ward also submitted a letter to Gayle Fridkin, Westvaco's Personnel Services Supervisor, explicitly stating that "any statements made ... are not intended as a waiver by me of my position that I would have been able to continue to perform my duties as an employee of Westvaco if Westvaco had made reasonable accommodation for my disability." *See* Plaintiff's L.R. 56.1 at D ¶ 3. Ward attached this letter, dated March 1, 1991, to his application for disability retirement benefits. Ward's clear and deliberate qualification of his handicap status in his application for disability benefits takes his case outside the framework of *August.* In *August,* the court of appeals noted that summary judgment was appropriate because there was no disputed issues of fact whether the plaintiff was a "qualified handicapped person" under Mass.Gen.Laws ch. 151B. Here, disputed issues exist as to whether Ward was a "qualified handicapped person."

Ward alleges that his claim of handicap discrimination is supported by Westvaco's treatment of him when his handicap became noticeable to Crutchfield. For example, Ward alleges, among other things, that Crutchfield limited his responsibilities upon the manifestation of his handicap, that he was treated in a condescending and demeaning manner because of his handicap, that

non-handicapped persons were given his duties and that he was not allowed to develop the necessary skills on the MacIntosh computer which would have made his job "essential" to the Marketing Department and protected him from the reduction in force. Ward says that the reduction in force was just a convenient opportunity to terminate him based on his handicap. Ward adds that his job responsibilities were then given to younger, non-handicapped employees.

As further evidence of discrimination, prior to the elimination of his position as a marketing specialist, Ward requested reasonable accommodations. Specifically, Ward suggested that he be given a larger display screen or different lighting and that he be given a little more time to review documents. While a jury may decide that Ward's request for accommodations came at the eleventh hour when faced with the news of an imminent reduction in force, it is undisputed that Westvaco did not provide him with any accommodations and terminated Ward approximately one month after he disclosed his handicap.

Of course, Ward's claim of handicap discrimination is weakened, to a great extent, by the fact that Ward did not inform Westvaco of his handicap until *after* Westvaco disclosed its plan to eliminate all non-essential employees as part of its reduction in force. In fact, as noted, when Crutchfield expressed her concerns to Ward regarding his vision, he steadfastly denied that he had any problems and said that he had taken care of his eyesight problem. At one point, he told Crutchfield that his vision problems were corrected by a new prescription eye glass. Also, it was not until after the reduction in force plan was announced that Ward requested that Westvaco provide him with reasonable accommodations. "Employers cannot be required to accommodate needs they do not know exist. This must be so, because employers risk liability for discrimination when they unilaterally decide to treat a handicapped person differently from anyone else." *Conway v. Boston Edison Co.,* 745 F.Supp. 773, 783 (D.Mass.1990) (citing Mass. Gen.Laws ch. 151B § 4(16).

While the evidence of handicap discrimination is tenuous at best, plaintiff has nevertheless produced sufficient facts to entitle him to reach a trier of fact on this claim. First, while Westvaco might not have known that Ward suffered from retinitis pigmentosa, it is clear that Westvaco was aware of general problems with his vision. Second, it became apparent while Ward was being trained on the MacIntosh computer that he had difficulty in reading certain characters displayed on the screen. Crutchfield noticed that during the training session he had to get up and change his position in the room so that he better see the screen. Ward's request to enlarge the font size was denied by Crutchfield. Westvaco's position that Crutchfield's denial of Ward's request to change the font size was because it was inefficient and that Ward did not need to use the MacIntosh to perform his job may very well prove successful at trial. However, a jury could reasonably conclude otherwise. Third, while his request was undeniably late, Ward did inform Westvaco that, with reasonable accommodation, he could perform the essential functions of his job as it existed prior to the time Westvaco stripped him of his job responsibilities. Despite Ward's specific requests (such as illuminated lighting), Westvaco failed to make reasonable accommodations for Ward's handicap. Fourth, a jury could also consider the closeness in time between plaintiff's informing Westvaco of his medical condition and requesting reasonable accommodations and his termination. Fifth, in a memo to her supervisor in 1990, Crutchfield criticized Ward's overall job performance. She noted Ward's vision problems and concluded that sooner or later "someone will have to bite the bullet and deal with his deteriorating performance." While Westvaco claims that Ward's position was unique and therefore they did not need to compare his performance with other marketing specialists, a jury could conclude that it was Crutchfield's actions in limiting plaintiff's responsibilities that caused Ward's position to be characterized as "unique." Based on all of this evidence, a jury could reasonably infer that Westvaco had already decided to terminate Ward because of his poor performance due to his handicap and that the reduction in force was merely pretextual for handicap discrimination.

Westvaco's position that handicap discrimination did not play a role in determining the positions subject to the reduction in force is strong and very well may prove successful at trial. Nevertheless, a jury is in the best position to decide these factual disputes. The court will deny summary judgment on plaintiff's claim of handicap discrimination.

**B.** *Plaintiff's Age Discrimination Claim.*

■ In his second amended complaint, plaintiff alleges age discrimination in violation of Mass.Gen.Laws ch. 151B and the federal Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621. The respective burdens of proof are the same in an age discrimination claim whether pled under Mass.Gen.Laws ch. 151B or the ADEA. *See Fontaine v. Ebtec Corp.*, 415 Mass. 309, 312, 613 N.E.2d 881 (1993); *Johansen v. NCR Comten, Inc.*, 30 Mass.App.Ct. 294, 568 N.E.2d 611 (1991); *Radvilas v. Stop & Shop, Inc.*, 18 Mass.App.Ct. 431, 439, 466 N.E.2d 832 (1984).

■ In a case alleging age discrimination, plaintiff bears the ultimate "burden of proving that his years were the determinative factor in his discharge, that is, that he would not have been fired but for his age." *Le-Blanc v. Great American Ins. Co.*, 6 F.3d 836, 842 (1st Cir.1993) (further citations omitted). In a case such as this where plaintiff has produced no direct evidence of age discrimination, the court applies the familiar *McDonnell–Douglas* burden shifting analysis.

■ In order to establish a *prima facie* case of age discrimination plaintiff must prove that he 1) was in a protected age class; 2) met the employer's legitimate job performance expectations; 3) experienced adverse employment action; and 4) was replaced by a person with similar job qualifications. *Id.* at 842; *See e.g. Goldman v. First Nat'l Bank*, 985 F.2d 1113, 1117 (1st Cir.1993). In the context of a reduction in force case, a plaintiff can satisfy the fourth prong by demonstrating that

> the employer did not treat age neutrally in shrinking its payroll. This lack of neutrality may be manifested either by a facially discriminatory policy or by a policy which, though age-neutral on its face, has the effect of discriminating against older persons, say, by leading inexorably to the retention of younger employees while similarly situated older employees are given their walking papers.

*Vega v. Kodak Caribbean, Ltd.*, 3 F.3d 476, 479 (1st Cir.1993).

■ Once the plaintiff establishes a *prima facie* case of age discrimination, the burden then shifts to the defendant to articulate a legitimate non-discriminatory reason for its actions. The First Circuit recently noted that

> [t]he presumption of unlawful age discrimination generated by the plaintiff-employee's prima facie showing dissipates, however, provided the employer sustains its burden of production; the plaintiff employee must then demonstrate that the proffered reason for the adverse employment action was simply a pretext for age discrimination. The plaintiff must do more than cast doubt on the employer's justification for the challenged action; there must be a sufficient showing that discriminatory animus motivated the action. Direct or indirect evidence of discriminatory motive may do, but the evidence as a whole must be sufficient for a reasonable factfinder to infer that the employer's decision was motivated by age animus.

*Frankina v. First Nat'l Bank*, 1993 WL 113727, *3, 1993 U.S.App. LEXIS 7714, *5–6, No. 92–2156 (1st Cir. April 14, 1993). *See also, St. Mary's Honor Ctr. v. Hicks*, —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). In *LeBlanc* the First Circuit stated that once the employer articulates a legitimate non-discriminatory reason to terminate an employee "the *McDonnell–Douglas* presumption 'drops out of the picture.'" 6 F.3d at 843 (quoting *St. Mary's Honor Ctr. v. Hicks*, —— U.S. at ——, 113 S.Ct. at 2749).

With these standards in mind, the court will turn to plaintiff's claim of age discrimination.

Westvaco contends that it is entitled to judgment as a matter of law because plaintiff cannot prove the fourth prong of the *McDonnell–Douglas* analysis, that its decision to

terminate Ward's employment was not age neutral. Westvaco asserts that the undisputed facts clearly demonstrate that age did not play a factor in eliminating Ward's position. Recognizing, however, the relatively low burden a plaintiff must carry to establish a *prima facie* case, defendant asserts that its decision to terminate Ward may be legitimately justified by the fact that Ward's position in the Marketing Department was no longer essential.

■ At this stage in the proceedings the burden shifts back to the plaintiff to offer sufficient evidence for a jury to determine whether Westvaco's decision to terminate Ward was motivated by intentional age discrimination. More than "minimally sufficient evidence of pretext" is required at this stage. Ward must offer evidence that overall reasonably supports a finding of discriminatory age animus. *LeBlanc v. Great American Ins. Co.*, 6 F.3d at 843. It is not necessary to present "smoking gun" type of evidence of discriminatory animus; plaintiff can offer circumstantial evidence that supports a reasonable inference that the employer's justification for his termination was a pretext for age discrimination. *Goldman v. First Nat'l Bank*, 985 F.2d at 1119 (further citations omitted).

In support of his claim of discriminatory animus, Ward points to several memos written by Crutchfield to Reed in which she suggests that plaintiff be terminated prior to the reduction in force. According to Ward, whether the reduction in force was implemented in a non-discriminatory manner as Westvaco claims is irrelevant to his case because the decision to terminate him was made *prior* to the reduction in force. In fact, defendant admits that in December of 1990 Crutchfield had a discussion with Reed and eliminated Ward's position as marketing specialist from her budget. The reduction in force and Ward's termination did not occur until March 1, 1991. Several other memoranda from Ward's supervisors to Westvaco management prior to the reduction in force recommending that Ward be either terminated or transferred to another department. While none of these memos specifically refer to Ward's age in determining that Ward's job

performance was unsatisfactory, plaintiff asserts that reasonable inference of age animus can be drawn from the surrounding circumstances.

■ The heart of plaintiff's age discrimination claim, which to a large extent parallels his claim of handicap discrimination, seems to be that his job responsibilities were diminishing as he got older. For instance, Ward suggests that younger employees were given the opportunity to become proficient in the MacIntosh computer when Crutchfield told plaintiff not to continue learning on the computer because it was not an essential function of his job.

Next, and more importantly, plaintiff maintains that discriminatory animus can be shown by Crutchfield's remarks, which were often critical of older employees and which frequently disparaged older person's methods of operation. On plaintiff's version of the facts, which the court must accept in ruling on this motion, Crutchfield stated that older employees were part of the "old boy network," that older people in the marketing department were set in their ways, and that it was time for these people to turn the "reins over" to younger people.

Plaintiff's evidence of age discrimination can only be described as marginal and rests on, at least to a large extent, circumstantial evidence. The First Circuit has noted that circumstantial evidence is to be expected in discrimination cases "given the complexity of the issues and the difficulty, in this rights conscious era, of producing direct evidence of discrimination." *Hebert v. Mohawk Rubber Co.*, 872 F.2d 1104, 1115–16 (1st Cir.1989) (further citations omitted). In *Hebert* the court acknowledged the situation in which, in an attempt to implement a reduction in force, an employer "impermissibly determines to avert disaster by acting in a discriminatory way, mistakenly equating age with lack of productivity." *Id.* at 1116.

Westvaco claims that these statements are mere isolated "stray remarks" which were not directed toward Ward and are insufficient to prove discriminatory age animus. *See e.g. Gagne v. Northwestern Nat. Ins. Co.*, 881 F.2d 309, 314 (6th Cir.1989). However,

in *Siegel v. Alpha Wire Corp.,* 894 F.2d 50, 55 (3rd Cir.1990), the Third Circuit held that an inference of age animus could be supported by statements made by an employer to the effect that "old dogs won't hunt," allegedly referring to persons over the age of forty. The court noted whether the employer was referring to older employees of the company or not was "precisely the sort of question which must be left to the jury." *Id.* Similarly, in *Hebert v. Mohawk Rubber Co.,* 872 F.2d 1104 (1st Cir.1989), the First Circuit denied defendant's motion for summary judgment on an age discrimination claim relying in part on evidence that the employer made a remark that "it's time we older guys turned the daily reins to some other group." *Id.* at 1115. Here, the remarks allegedly made by Crutchfield were not as "stray" as Westvaco would have the court believe: Crutchfield was instrumental in the decision to terminate Ward.

Although this case is close, plaintiff has produced enough evidence of age animus to survive defendant's motion for summary judgment.

C. *Equal Rights Act Claim.*

■ Summary judgment must be granted on plaintiff's Equal Rights Act Claim (MERA), Mass.Gen.Laws ch. 93, § 103. This court has held in a similar employment discrimination case that, as a matter of law, MERA does not provide a separate remedy for employment discrimination over and above those provided by Mass.Gen.Laws ch. 151B. *See Martin v. Westvaco,* 850 F.Supp. 83 (D.Mass.1994).

In his memorandum in opposition to defendant's motion for summary judgment, plaintiff asks this court to delay its ruling on the MERA claim until the S.J.C. definitively answers this question. However, since the time plaintiff filed its memorandum, the S.J.C. has resolved this issue. Recently, in *Charland v. Muzi Motors, Inc.,* 417 Mass. 580, 631 N.E.2d 555 (1994), the S.J.C. concluded that, where applicable, chapter 151B provides the exclusive remedy for employment discrimination. Similarly, in *Agin v. Federal White Cement, Inc.,* 417 Mass. 669, 632 N.E.2d 1197 (1994), the S.J.C. held that when a remedy is available under Mass.Gen.

Laws ch. 151B, a plaintiff may not pursue a claim under MERA. *See also, Napolitan v. New England Telephone Co.,* No. 91–12973–MA, 1993 WL 65093, 1993 U.S. Dist. LEXIS 7770 (D.Mass. Jan. 15, 1993); *Conway v. Boston Edison Co.,* 745 F.Supp. 773 (D.Mass. 1990); *Pappas v. Chestnut Knoll,* C.A. No. 91–0044, slip op. at 3–4 (Hampden County Superior Court, July 18, 1992). *Mouradian v. General Electric Co.,* 23 Mass.App.Ct. 538, 503 N.E.2d 1318, *rev. denied,* 399 Mass. 1105, 507 N.E.2d 1056 (1987).

Summary judgment on plaintiff's MERA claims will be allowed.

## V. CONCLUSION

For the foregoing reasons, the defendants' Motion for Summary Judgment is DENIED as to Counts I, II and V, the age and handicap discrimination claims under 151B and the ADEA. Defendant's motion for summary judgment is ALLOWED as to Counts III and IV alleging age and handicap discrimination under MERA. A separate order will issue.